**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Lawrence A. SHAFER et al.,**
**Defendants.**

**No. CR 74–165.**

United States District Court,
N. D. Ohio, E. D.

March 29, 1974.

------

Robert Murphy, Paul Lawrence, John Hoyle, U. S. Dept. of Justice, Washington, D.C., for plaintiff.

Bernard Stuplinski, C. D. Lambros Cleveland, Ohio, E. K. Wright, Dover, Ohio, Jack Schulman, Michael Diamant, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Defendants have moved this court pursuant to Rule 41 F.R.Cr.P. for an order suppressing statements made by them to members of the Ohio National Guard. These statements took the form of oral admissions, written narratives, and "firing incident reports." An evidentiary hearing was held with all parties to the action presenting testimony and submitting extensive briefs. Since the defendants were collectively members of separate and distinct National Guard units,[1] it will be necessary to recount the actions of each with some redundancy as the inevitable result.

Immediately after the shooting incident on the Kent State campus, guardsmen who were at the scene, including defendants, regrouped in a position of relative saftey near the burned-out ROTC building. Defendants testified that at that point in time they were emotionally upset and apprehensive about future events.

Because of the gravity of the shooting incident, Colonel John Spain was appointed "investigating officer" by General Canterbury. To assist him in conducting the investigation, Colonel Spain requested the aid of Captain Robertson. Captain Robertson asked for a Manual for Courts Martial so that he might advise the troops of their rights under Art. 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831. Colonel Spain minimized the need for such a manual on the grounds that the investigation was strictly an internal one.

This investigation was initiated by the small unit commanders passing through the troop formations questioning the men as to who among them had fired their weapons, how many rounds they had fired, and the nature of their targets. With regard to "G" Troop, 107th Armored Cavalry, this task was performed by Lt. Stevenson. It is unclear from the record who in Companies "A" and "C", 145th Infantry, elicited this information from the men.

Those troops in the 145th Infantry who acknowledged firing their weapons were separated from the main unit and taken as a group to a gymnasium annexed to the campus police station. There were several Guard officers present but no police or other law enforcement officials in attendance. The men were provided with writing implements and told in precatory language to make a written statement recounting their actions at the time of the shooting. Despite the informal tenor of the officer's request to make a statement, it is clear that the defendants construed it as an order and such construction by an enlisted man is reasonable. At no time were the men advised of their constitutional rights as prescribed in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also*

---

1. Defendants Pierce, McGee, Zoller, Perkins and Shafer were members of "G" Troop, 107th Armored Calvary while McManus and Smith were members of "A" and "C" Companies, 145th Infantry.

United States v. Tempia, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967); 10 U.S.C. § 831; O.R.C. § 5924.31.

Some of the guardsmen objected to the preparation of a statement and one defendant (McManus) objected to the narrative form of the statement since it did not coincide with his understanding of a "firing incident report." A Guard officer assured the men that the statements were for the benefit of the Guard and that no one would see them. At that point the defendants in the 145th Inf. completed their signed statements.

The men in "G" Troop, 107th Armored Cavalry who had admitted firing their weapons were not immediately taken to the gymnasium. Instead they continued to perform their regular duties and at a later time were assembled and ordered to the gymnasium to make a statement. As with the men in the 145th Inf., the men of "G" Troop were accompanied by several Guard officers as they completed their statements. No *Miranda* warnings or their military counterpart, Art. 31 U.C.M.J., were given to the men.

The handwritten narrative statements were subsequently used in preparation of "firing incident reports." These are printed forms with typewritten answers to specific questions relating to the discharge of a weapon. The relevant information was extracted from the handwritten statements and transposed onto the firing incident reports by headquarters personnel. No defendant was personally responsible for the completion of such a report.

The handwritten statements were made available to the Inspector General, and were subsequently incorporated verbatim into his final report to the Adjutant General of the State of Ohio. While the investigation which produced these statements may not properly be characterized as a "police-type" investigation, it is unquestioned that both Guard and State officials considered them in determining whether to bring criminal charges against the guardsmen

involved, and that such potential use of the statements was contemplated from the outset of the investigation.

■ The instant proceeding before the Court is indicative of the unique problems posed by this entire action. We are presented with National Guardsmen on trial in a civilian court for acts allegedly committed while in an active duty status and in the course of their official duties. Thus it is necessary to look to the military courts for guidance in construing the applicable law. The decisions of the United States Court of Military Appeals are in no way binding upon this Court. But their analysis of certain military procedures is immensely helpful in effectuating the controlling precedents.

There are three evidentiary inquiries to be made by the Court. These go to the admissibility of the oral admissions and handwritten statements made by the defendants, as well as the firing incident reports that were extrapolated from the defendants' narrative statements. These will be considered seriatim.

■ The oral questioning of the troops immediately after the shooting incident falls beyond the purview of the *Miranda* decision.

> "General on-the-scene questions as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." 384 U.S. at 477, 86 S.Ct. at 1629.

The United States Court of Military Appeals reached a similar conclusion in United States v. Henry, 21 U.S.C.M.A. 98, 44 C.M.R. 152 (1971). In that case an army captain, upon arriving at the scene of a shooting, inquired of the assembled men "who shot who." As the court stated:

> "Captain Fleming had 'no idea of what had happened' and he 'wanted to find out' who 'was hurt and where he was' and 'who had done the shooting.' He suspected some 'sort of criminal activity.' Speaking 'basically to the

group' he asked 'who shot who'". 21 U.S.C.M.A. at 99.

In resolving the effect of the failure to warn the men of their constitutional rights prior to questioning them, the Court reasoned:

"Since Fleming suspected none of the group of being involved in the shooting and had no information that reasonably should have put him on notice, he did not need to give preliminary advice as to the right to remain silent." 21 U.S.C.M.A. at 101.

Similarly, in the instant case the Guard officials had no reason to suspect any individual guardsmen of being involved in the shooting incident. Immediately after the shooting confusion reigned and rumors ran rampant. The men were queried merely to ascertain "what happened." Although the men were removed in time and space from the actual scene of the shooting because of the exigencies of the situation, the mere determination of who had fired their weapons, how many rounds had been fired, and at whom, constitutes "general on the scene questions," and therefore was outside the parameters of the *Miranda* holding. See e. g., United States v. Tobin, 429 F.2d 1261 (8th Cir. 1970); Lowe v. United States, 407 F.2d 1391 (9th Cir. 1969); Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968); Arnold v. United States, 382 F.2d 4 (9th Cir. 1967); O'Neal v. Swenson, 301 F.Supp. 1105 (W.D.Mo.1969); United States v. Kuntz, 265 F.Supp. 543 (N.D.N.Y.1967). For this reason, the oral statements made by the defendants immediately after the shooting incident are admissible into evidence at trial.

The handwritten statements made by the defendants present more intricate problems. As a base point of reference, we must again look to *Miranda*. Simply stated, the basic mandate of *Miranda* is this:

"The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612.

Because of the unique factual context out of which this action arose, the application of the literal language of *Miranda* would have little meaning, and, more importantly, would reduce the essence of its holding to a hollow shell. The fact that defendants were never confronted by law enforcement officers or were not deprived of their freedom of action any more than on any other drill weekend is of little significance. The rights guaranteed by the constitution as interpreted by *Miranda* are of too great consequence to be held ephemeral in the face of a factual aberration. Thus it is necessary to translate the terms of *Miranda* into a military context so as to effectuate their meaning.

■ In order for this Court to find that the defendants were entitled to *Miranda* warnings it is necessary to find "custody" and "interrogation" of the defendants by some individual with legal authority over them. Clearly, "custody" of military personnel does not require the same restraints as in civilian life; similarly, "interrogation" takes on a far different meaning in a military environment, where any superior officer has the right to demand that his questions be answered.

■ It has been held that "custody" over military personnel occurs when there has been some assumption of control over their movements. United States v. Higgins, 39 C.M.R. 440, 442 (1967). This "control" may take many forms, such as ordering a person to appear at a specified time and place for the purpose of making a statement.

"In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without

regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action." United States v. Tempia, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

The defendants in the instant case were unequivocally ordered to report to the gymnasium with the express intention that they make a statement.

▮ The remaining questions of what constitutes "interrogation," and by whom it must be done, have been succinctly answered;

"We have determined that if the request for a statement is made in the 'course of official interrogation' by a law enforcement officer or by a person with disciplinary authority over the accused, Article 31 is applicable." United States v. Fisher, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972).

Thus a request for a statement in the course of an official investigation by a person with authority over the accused is sufficient to trigger the need for Article 31 warnings which are the military cognate of the *Miranda* warnings. That is precisely the situation in which the defendants' handwritten narratives were taken. Thus they were entitled to be advised of their constitutional rights prior to making any such statement. For this reason such handwritten narrative statements are inadmissible at trial.

▮ At this point it should be noted that defendant Smith did not make a written statement but instead was questioned at his tent in the company area by his superior, Sgt. Wentch. Smith was queried as to whether he had fired his weapon or had seen any students killed. Smith answered the questions put to him by Sgt. Wentch since he considered himself under orders to do so. No *Miranda* warnings were given to Smith prior to his being questioned by Sgt. Wentch. Several factors distinguish Smith's oral admissions from those of the other defendants. Smith was questioned several hours after the shooting while the rest

of the defendants were questioned within minutes. Smith made his oral statement as the result of a one-to-one confrontation with Sgt. Wentch while the remaining defendants responded to a question put to the guardsmen as a group. It is clear that Sgt. Wentch was not seeking to find out "what happened" as part of "on the scene questioning" but rather was interrogating Smith on an individual basis after assuming *de facto* control over his movements. *See Miranda v. Arizona*, and *United States v. Higgins, supra*. Under these circumstances, the absence of *Miranda* warnings renders Smith's statement to Sgt. Wentch inadmissible at trial.

▮ The "firing incident reports" compiled from the handwritten statements are likewise inadmissable as "fruit of the poison tree." *See Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The reports were completed by extracting information directly from the handwritten statements. It is difficult to conceive of a more substantial nexus between the two documents. Thus, the firing incident reports were not "gained from an independent source", *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), nor is the connection between the illegally obtained statement and the firing incident reports "so attenuated as to dissipate the taint." *Nardone, supra*, 308 U.S. at 341, 60 S.Ct. at 268; *Costello v. United States*, 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The firing incident reports have "been come at by exploitation of that illegality" and not "by means sufficiently distinguishable to be purged of [that] primary taint". *Wong Sun, supra*, 371 U.S. at 488, 83 S.Ct. at 417. For these reasons, the firing incident reports must be suppressed at trial.

The above constitute the court's findings of fact and conclusions of law.

It is so ordered.