THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL R. PALUMBO, Appellant.

First Department, December 19, 1978

444

## APPEARANCES OF COUNSEL

*Allen Green* of counsel *(Bell, Wolkowitz, Beckman, Klee & Green,* attorneys), for appellant.

*Norman Barclay* of counsel *(Robert M. Pitler* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

LUPIANO, J. P.

Defendant, who held the position of Director of Leasing for the New York City Real Estate Department, was charged with accepting a $3,000 gratuity from one Haller, a real estate broker. The gratuity was not solicited by defendant and was offered after defendant had properly participated in certain

lease negotiations. Apparently the gratuity was given as a form of "thank you" aimed at the obtaining of a favorable relationship to facilitate future deals. The broker, Haller, arrested in another matter, agreed to co-operate with the authorities and reported the payment of the $3,000. Pursuant to instruction, the broker contacted defendant and attended appointments at which he was wired for sound.

■ The resultant tapes, which disclose "loose talk" and "gossip" about general corruption in the Real Estate Department together with unrelated and objectionable evidence concerning defendant's so-called failure to co-operate with the authorities, were admitted into evidence and utilized in such fashion as to deprive defendant of a fair trial on the issue of whether he accepted a $3,000 unsolicited "tip" for having discharged his responsibilities in a lawful manner. This improper utilization of the tapes served to inject evidence which the jury was sure to interpret as an unwillingness on the part of the defendant to co-operate with the authorities in the investigation of unspecified and unrelated charges of "corruption" within the city's Real Estate Department, matters not only immaterial to the instant charge, but also matters of which defendant may have had no actual knowledge.

For example, on direct examination of Haller, the broker, and in cross-examination of the defendant, the prosecution directed inquiry to those parts of the taped conversations concerning other persons and other matters within the city Real Estate Department. Patently, the People may not support their case against defendant by indirect reference to corruption within the city Real Estate Department with the obvious implication that defendant was involved in other, uncharged misdeeds. The improper use of the tapes may not be facilely justified on the basis that this tended to establish the relationship between the broker and the defendant or that it was merely an attempt to impeach credibility. There was no valid proof of any other wrongdoing on defendant's part, and the import of the cross-examination clearly tended to convey the impression that defendant was withholding information.

Furthermore, on its direct case, the People questioned Deputy Commissioner Lupkin in such a manner as to convey the impression that defendant was brought to Lupkin's office on June 3, 1976, for the purpose of supplying information about "official corruption" and that defendant failed to co-operate in this investigation. The People's attempt to justify this evi-

dence on the ground that it was relevant to the issue of voluntariness of the June 3 confession is strained, as the reason why defendant was summoned to Lupkin's office is relatively insignificant when compared to and contrasted with the manner and circumstances of defendant's being delivered to the office and the mode of questioning employed thereat. By getting before the jury evidence that defendant failed to co-operate with an investigation into corruption within the city Real Estate Department, the People impermissibly connected defendant with uncharged "corruption" (see *People v Mackell,* 47 AD2d 209, affd 40 NY2d 59; *People v Stanard,* 32 NY2d 143). Parenthetically, it is noted that the instant trial is the second on the indictment, the first having resulted in a mistrial when the jury was unable to reach a verdict.

Regarding the issue of whether defendant's statement of June 3, 1976 should be suppressed, the pertinent surrounding circumstances are as follows: Two detectives, one from the District Attorney's squad and one from the New York City Department of Investigation, were instructed to proceed in the early morning of June 3, 1976 to defendant's area of residence and to intercept him when he was alone, that is, not in the presence of family members or others. They were to ask defendant to accompany them to the Department of Investigation. If defendant refused, they were ordered not to arrest him. However, the detectives were instructed that one was to accompany defendant on the train and the other would return by car to the city and get in touch with the department for further instructions. The detectives drove up to defendant's residence and observed his car in the driveway. They then drove to the railroad station and waited for defendant who commuted to work. After defendant was driven to the station by his wife, who thereafter left, and while waiting for his train, the detectives approached, identified themselves, and requested that he accompany them to the Department of Investigation for a routine matter. Defendant, by virtue of the fact that the detectives were intercepting him in the morning on his way to work, opined that the matter appeared to be more than "routine." According to defendant, he was fearful that a disturbance would draw the attention of his neighbors, and he acquiesced in accompanying the detectives to their car. His inquiry as to whether he needed a lawyer was responded to in equivocal fashion, to the effect that his co-operation would avoid such necessity. Throughout this period, and for a

substantial time prior thereto, defendant was suffering from conjunctivitis, which he maintained interfered with his sleeping habits. Indeed, despite the unusual circumstances of defendant's being accosted by the detectives while on his way to work, he, according to their testimony, slept in the car on the ride back to New York.

Ushered into the office of Commissioner Lupkin, defendant, in the presence of the two detectives, was confronted by Commissioner Lupkin, an Assistant United States Attorney, an Assistant District Attorney and an attorney employed by the Department of Investigation. In the ensuing four-hour interview held in this modest office (approximately 20' by 25'), defendant was made aware of possible prosecutions against him for bribery, tax evasion and perjury if he lied under oath. Even when defendant during the course of the interview went to the rest room, he was accompanied by one of the detectives who did not make use of the facility. The presence of the detectives at the interview was justified on the basis that they were acting as witnesses to what transpired.

The informal aspect of the interview ended about 1:20 P.M. and a formal statement commenced. A stenographer entered the room and defendant was then for the first time advised of his constitutional rights. Prior to the formal statement and during the course of the "informal" phase of the interview, defendant stated that he had accepted the $3,000 gratuity.

■■ Defendant asserts that his requests for assistance of counsel, uttered from time to time during the course of the interview, were ignored. Witnesses for the People declare that defendant did not make such requests. In light of the resolution of the issue of credibility in favor of the People's witnesses by the court on the suppression motion, we accept the People's narration on this point. However, this is not dispositive of the issue as to whether there was custodial interrogation prior to the warnings being administered.

"In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position" (People v Yukl, 25 NY2d 585, 589). Patently, there are several factors to be considered, among which are the place and duration of the interview. Additional factors are the degree to which the law enforcement officials

dominate the atmosphere of the interview, the existence of threat or inducement, the age, physical and mental state of the detainee. On this record, viewing the totality of the surrounding circumstances, we hold that as a matter of law an innocent individual in defendant's position would have reasonably considered himself to be in custody prior to the warnings given at the formal phase, that is, at the end of the lengthy interview. Defendant was clearly the object of an investigation which had focused upon him and the interview was held pursuant to an agreed upon plan to pick defendant up without apprising him of his rights or telling him the purpose for which he was picked up.

■■ The coercive nature of the interview, gleaned from the totality of the surrounding circumstances, mandated the giving of the *Miranda* warnings. In the absence of these warnings prior to the oral admission of defendant, it is clear that such statement is inadmissible and should have been suppressed. In light of the suppression of defendant's June 3, 1976 statement, it follows that the indictment must be dismissed as there is no corroboration of the testimony of Haller, the broker.

In any event, if we were not reversing and dismissing the indictment, we would reverse and direct a new trial in view of the deprivation of a fair trial.

Implied, if not explicit, in the rationale of the dissent, is the apprehension that custody in the formal sense of that term and coercion are equivalents. In this reasoning, the absence of such custody is equated with a similar absence of coercion, and the conclusion may thus be reached that defendant, not being in custody, is not entitled to the *Miranda* warnings. The issue here is not whether defendant was in custody in the general sense, but whether the surrounding circumstances of defendant's interrogation, viewed as a whole, mandate the conclusion that such interrogation amounted to "custodial interrogation."

■ Of course, *Miranda* requires that a person who is taken into custody or deprived of his freedom in any significant way is entitled to be advised of his constitutional rights before the interrogation proceeds. Formal arrest and physical detention clearly warrant *Miranda* warnings. The problem arises when a person is not formally arrested and taken into custody (see *People v Rodney P. [Anonymous]*, 21 NY2d 1). Indeed, the Court of Appeals adopted the view that under *Miranda* a suspect is subjected to "custodial interrogation," not only if he

is questioned when in custody or when deprived of his freedom of action in any significant way, but also if he is questioned when he *reasonably believes* that he is so deprived *(People v Rodney P. [Anonymous], supra)*.

In *Miranda v Arizona* (384 US 436, 449) the United States Supreme Court on the issue of psychological coercion quoted from a police manual describing desirable interrogation tactics: " 'If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.' "

The factors of where the interrogation is held and who conducts same are of prime relevance among the totality of circumstances in determining whether "custodial interrogation" has occurred. Additional factors are the nature of the suspect, the time and nature of the interrogation and the progress of the investigation at the time of the interrogation (see Custodial Interrogation, Ann. 31 ALR3d 565). Parenthetically, it is beyond cavil that the investigatory process had focused upon defendant as is aptly pointed out in the dissent's narration of the facts. Although giving credence to the conclusory assertion by the People that the manner of defendant's being brought to Commissioner Lupkin's office was not motivated by a desire to intimidate, but to prevent defendant's alerting others about whom he had made insinuation of corruption, the dissent is silent about the relevance of another fact which is set forth in the dissent, to wit, that defendant had one month before been questioned at the offices of the Department of Investigation.

To reiterate, the coercive nature of the interview under the totality of the surrounding circumstances clearly demonstrates that there occurred "custodial interrogation" warranting the giving of *Miranda* warnings, which warnings were not given.

Accordingly, the judgment, Supreme Court, New York County (GORMAN, J., at trial; GOLDMAN, J., at motion to

suppress), rendered July 6, 1977, convicting defendant, after a jury trial, of receiving unlawful gratuities, should be reversed, on the law, defendant's motion to suppress his statement given to the Department of Investigation on June 3, 1976 granted, and the indictment dismissed.

SULLIVAN, J. (dissenting). Essential to the majority's suppression of the June 3, 1976 statement and dismissal of the indictment is the view that defendant was in custody at the office of the Department of Investigation, and was therefore entitled to the *Miranda* warnings before he gave his oral statement. This hypothesis is belied by the facts. Defendant, the Director of Leasing for the Department of Real Estate of the City of New York, was no stranger to the Department of Investigation since he had been questioned at its offices just one month before and had, in fact, given a statement under oath.

On this occasion, June 3, 1976, it had been decided to contact defendant between his home and office so that he would have no opportunity to contact other employees of the Department of Real Estate, who might be under investigation, in order to reconcile their stories. Defendant was met by two detectives at the railroad station, rather than at his home in North Tarrytown, so as to avoid embarrassing him in front of his family and friends.

When defendant and the two detectives arrived at the Department of Investigation offices, they proceeded to the office of Stanley Lupkin, First Deputy Commissioner. At the outset, defendant was told by Commissioner Lupkin that he could leave whenever he wanted, and was not obliged to answer any questions.

Defendant, who at an earlier interview had denied receiving money from anyone in his capacity as a city employee, was told that evidence of a payment of $3,000 to him by Haller had been developed. Initially, defendant stated that he had no recollection of ever receiving money from Haller. A tape was played of a conversation which took place between defendant and Haller, three years after the payment. The tape contained incriminating evidence. After some questioning by Commissioner Lupkin defendant admitted his involvement, stating "so you got me."

During the questioning defendant never asked for an attorney, nor did he refuse to answer questions. He was repeatedly

reminded that he was free to leave whenever he wanted. While he was told that he might be indicted for accepting the $3,000, he was advised that he would not be indicted for leaving the department's office. Defendant's obvious concern was over whether his job and pension could be saved.

Later, when the stenographer arrived, defendant was sworn and was read his constitutional rights. When asked if he wanted an attorney present, defendant replied "no need." He was also told that his refusal to answer questions, alone, would not subject him to dismissal. Commissioner Lupkin again reminded defendant that the proceeding would be terminated if he wished to change his mind and consult a lawyer. Before the recorded statement was concluded, defendant acknowledged that he had come to the commissioner's office voluntarily and that he had been told that he was free to leave at any time. There was no off-the-record conversation once the recorded proceeding began. At the conclusion of the statement defendant left to return to his home.

Defendant's excuse that his conjunctivitis sapped his will is a mere facade. He had suffered from the disease for 10 years, and had functioned well, working for that entire period. Indeed, he had attained the office of Director of Leasing since contracting the disease. On the morning in question he was on his way to work, not to a doctor for treatment.

On the basis of these facts, which were adduced at the suppression hearing, the court properly refused to exclude defendant's June 3, 1976 statement, finding that defendant's answers were voluntary, not coerced, and that the interview had not been conducted while defendant was in a custodial status. That finding was eminently correct and should not be disturbed. When defendant arrived at Commissioner Lupkin's office, he was not in custody and it was thus not necessary to warn him of his *Miranda* rights at the outset of the interview. Custody occurs when a person reasonably believes that he has been deprived of his freedom of action, or that his freedom of action has been restrained by law enforcement officials. *(Oregon v Mathiason,* 429 US 492; *People v Yuhl,* 25 NY2d 585, cert den 400 US 851.)* Defendant, understandably, was uncomfortable when confronted with evidence of his involvement in a crime, the repercussions from which could be imprisonment, disgrace and loss of job and pension rights. But it hardly serves to convert this meeting, even with all of its attendant unpleasantness, into a custodial situation.

The taped conversation between defendant and Haller was received in evidence without objection, so that any error in its reception is not preserved for review, unless reversal is warranted in the interest of justice (CPL 470.15). The tape was relevant not only to confirm defendant's acceptance of the $3,000 but, as well, because the conversation showed the nature of the relationship between defendant and Haller. Defendant's willingness to speak about illicit activities in his agency was a tacit recognition that the two had "done business" on an earlier occasion.

At no time did the People attempt, either in their examination of Haller or cross-examination of defendant, to show that defendant was involved in any other corrupt transaction or to suggest that he was implicated in the deals he spoke about on the tape.

Commissioner Lupkin testified that defendant had been interviewed because State and Federal prosecutors wanted his co-operation in investigating the activities he described on the tape. Again, there was no objection to Lupkin's testimony about the continuing investigation into corruption in the Department of Real Estate. Objections were sustained to questions seeking to elicit the prosecutors' belief that defendant had information about wrongdoing and the witness accepted the court's characterization that Commissioner Lupkin had told defendant that he was being investigated. No attempt was made to imply that defendant was involved in any other illegality. Commissioner Lupkin did testify that he wanted to question defendant about whether he had information concerning illegal activities on the part of himself and others in the Department of Real Estate. He further testified that defendant denied having any evidence of corruption.

This evidence was necessary to demonstrate lack of coercion, inasmuch as defendant had claimed since the suppression hearing that he had been picked up by detectives on June 3, 1976 and held incommunicado at Department of Investigation offices, to force him into making an incriminating statement. The People were entitled to show that the manner by which defendant was escorted to Commissioner Lupkin's office was calculated not to terrorize him, but to prevent him from alerting those about whom he had made insinuations of corruption in the taped conversation and, if possible, to solicit his co-operation against those persons. Finally, and in any event, defendant himself testified at length at both the sup-

pression hearing and the trial about the efforts to secure his co-operation against others. No reversible error was committed in portraying the circumstances under which defendant was questioned and the purpose of the interrogation.

Accordingly, the judgment should be affirmed.

EVANS and MARKEWICH, JJ., concur with LUPIANO, J. P.; SULLIVAN, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on July 6, 1977, reversed, on the law, defendant's motion to suppress his statement given to the Department of Investigation on June 3, 1976, granted and the indictment dismissed.