■    THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID BRYANT, Appellant.—Judgment, Supreme Court, Bronx County, rendered October 25, 1976, affirmed. To the extent that the facts are set forth in the dissent, they are fairly stated and need not be repeated here. This is not to say that we accept the conclusions drawn by our dissenting brother, particularly to the effect that defendant's attendance at the police station was not willing on his part and that his eventual confession was coerced by means of involuntary police detention. At the very beginning, a "straw man" ("The police conceded that had Bryant sought to leave during the questioning, he would not have been permitted to do so.") should be identified and eliminated. There is not the slightest indication in the evidence that this attitude on the part of the police was ever conveyed to defendant. We do not have any indication at all that defendant had any idea that he was not free to leave at any time. His presence at the station house was completely voluntary; he said so himself: "I put on the clothes and went to the police station willingly." Again: "When I went to the police station, I went willingly, not knowing of such a crime, not knowing that any crime had happened but I went willingly". He spoke to the police voluntarily: "I told him [a policeman] I didn't commit such a crime so I'm willing to speak." The fact that his first statements concerning involvement in the crime were a mixture of admission and disclaimer bears not at all on the voluntary nature of his participation in the investigation. His mother, testifying in a manner that may be fairly characterized as noncommittal, capable of different interpretations, said nothing capable of being construed as an indication of involuntariness on defendant's part. There is an implication that there was something sinister and coercive in what the police did in checking out each of the statements made by defendant concerning his activities on the critical evening. Taxed by the police with having told untruths, defendant blithely uttered another falsehood which did not stand up under investigation. In this connection, consideration of a footnote in the dissent takes us along an interesting path: "Bryant did not testify at the suppression hearing. He did testify at trial, however, and stated that he went to the precinct voluntarily. This was not evidence before the suppression court, but more importantly would have been the only plausible trial posture. Had he testified that he went to the police station against his will, a natural conclusion for the jury to draw would be that his refusal to

accompany the police meant that he had something to hide." It is to be observed that defendant did not participate personally in the suppression hearing. Nor, although he had every opportunity to litigate, both at the hearing and at trial, the question of his mental capacity and whether his participation and statements were voluntary, this was not done. All of this is explained by the quoted footnote—it may be said, as sheer speculation—as a matter of trial tactics, repudiated entirely on this appeal. It is not any more speculative to consider that the jury might have concluded that defendant faced the police interrogation as a challenge of his ability to talk his way out of the difficulty, and that this was obvious to the jury. And his fate, i.e., that he ended by entangling himself by demonstrable and demonstrated lies is quite often the fate of most "smart alecs". The complete and utter failure of his lying statements, and the necessity for their investigation were brought about by defendant's own choice and not the result of a plot initiated by the police. Indeed, this appears to have been the prime cause of the length of time that defendant spent at the police station. Defendant is not to be heard to argue for the first time on this appeal that his appearance at the station house was other than voluntary. This is more than a matter of a finding from conflicting evidence; this was a flat and unequivocal admission in his own words by a party to this action, and not subject to speculation at this juncture. There was not probable cause for arrest at the beginning of interrogation, but defendant, his ploy having failed, and faced with the knowledge that the police had located a witness who had seen him following the victim, whom he had denied knowing, made a full inculpatory statement. At that point, it became proper for the first time to place him under formal arrest. *Dunaway v New York* (442 US 200) is cited, in our view, inappropriately for the proposition that this defendant's interrogation was improper. Obviously, such a conclusion must rest on a finding that it was custodial. We hold it was not. Concur—Markewich, Lupiano and Silverman, JJ.

Murphy, P. J., and Sullivan, J., dissent in a memorandum by Sullivan, J., as follows: about 1:50 A.M. on March 29, 1975, the body of eight-year-old Karen Smith was found on the rooftop landing of 1285 Washington Avenue, a building in a New York City Housing Authority complex in The Bronx. The victim had been stabbed several times and appeared to have been sexually assaulted. At about 3:30 A.M., Detective Chapman of the Housing Authority Police Department arrived at the scene. He spoke with Officer Clark, a housing police officer, who told him that he had "caught" Daniel Bryant, an 18-year-old neighborhood youth, on the same roof landing on other occasions. Clark also told Chapman that Bryant had been previously seen with young girls. Later that morning, at about 8:30 A.M., Chapman, accompanied by Sergeant D'Amico and Detective Nucci of the housing authority, went to Bryant's apartment. Bryant appeared at the door in his underwear. Chapman, displaying his shield and identifying himself, stated that he was investigating the death of a child at 1285 Washington Avenue. The officers were admitted into the apartment, and Chapman told Bryant the dead girl's name. He responded that he did not know the girl but had heard of the homicide. The officers then asked Bryant if he would accompany them to the South Bronx Housing Precinct. He said that he would, but that he first had to get dressed. Before the officers left the apartment, the *Miranda* warnings were read to Bryant. He was not asked, however, whether he understood them. Nor in reading Bryant his rights did the officers wait for his responses. Arriving at the precinct at about 9:05 A.M., Bryant was taken before the desk officer, who was told that Bryant was a "suspect" in a

homicide case. Chapman asked the desk officer for an arrest form so that he could read Bryant the Miranda warnings. On this reading of his rights, Bryant was asked whether he understood the warnings and responded affirmatively. The foregoing facts were established from the testimony of Detective Chapman at the suppression hearing. When Chapman testified for the second time, at trial, he stated that Officer Clark had told him that he had caught Bryant on the roof with young girls. But at the suppression hearing Chapman testified only that Clark caught Bryant on the roof, and that he had previously been seen with young girls. Under either version, however, the scant details furnished by Clark hardly suffice to establish probable cause for Bryant's arrest. This was conceded by the People at the Huntley hearing. The suppression court, however, found that Bryant accompanied the officers to the precinct voluntarily and, in reliance upon People v Morales (52 AD2d 818, affd 42 NY2d 129), held also that Bryant's detention was justified on the basis of reasonable suspicion. It is now firmly established that the station house detention and questioning, such as took place here, if not voluntary, cannot be based on less than probable cause, and that custodial interrogation cannot be equated with perfunctory on-the-scene questioning: "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." (Dunaway v New York, 442 US 200.) The questioning of Bryant was to continue for 11 hours. Bryant, of borderline intelligence (he has an I.Q. of 71), never asked to leave but continued to spin alibi stories which the police were able to discredit by sending officers back to Bryant's apartment building and questioning relatives and neighbors for verification. The questioning began at approximately 9:20 A.M., about 15 minutes after Bryant was taken to the precinct. It continued until around 7:30 P.M. that evening, when Bryant confessed to having had sexual intercourse with the victim, and stated that he had thrown the victim against a wall but could not remember if he had used a knife. Then he broke down and cried. Bryant first told the police that he had returned home for the last time on the previous evening between 10 and 10:15 P.M., eaten a pork chop, watched television, and had gone to bed at 1:10 A.M. While the interrogation continued, some officers returned to Bryant's residence, spoke to his stepfather, and determined that the family had not had pork chops for more than a week. The police then searched the garbage receptacles in the apartment and outside the building and were unable to find any trace of a pork chop. The police also went to the deceased's apartment and were told by her mother that Bryant knew the victim and had been a visitor at their home. The mother then gave the police a photograph of her daughter. The officers returned to the precinct and showed Bryant the victim's picture. After looking at it for over a minute he adamantly denied knowing her. Questioning continued throughout the day. There was a constant change of interrogators. At times questioning about the murders was discontinued, and the officers conversed with Bryant about a variety of subjects, such as religion, schooling, and his girlfriend. It was during these interludes that officers would be sent out to check Bryant's most recent version of his activities on the previous day. Essentially all of his accounts were false. Nearly all the people whom Bryant claimed he was with the day before denied having seen him. During one of these forays the officers spoke to a young boy who

claimed that he had seen Bryant following the victim the previous evening. Somewhere between 7:00 and 7:30 P.M., Sergeant Brent of the 7th Homicide Zone, New York City Police Department, arrived at the South Bronx Housing Precinct. After introducing himself, Brent said to Bryant, "you're still a young fellow. You've got a long life ahead of you" and "if you did it, get it off your chest". The other officers were asked to leave the squad room. Sergeant Brent repeated the *Miranda* warnings and Bryant confessed. Later that evening an Assistant District Attorney came to the precinct, gave the *Miranda* warnings, and conducted a question and answer session in the presence of a court stenographer which resulted in an even more detailed confession than Bryant had given to Sergeant Brent. The confessions should have been suppressed. At the outset, it must be noted that the intelligence of Bryant, who possessed a borderline mentality, may not be conclusive but is relevant in any consideration of whether he voluntarily went to the precinct with the officers, who lacked probable cause to compel him to accompany them. The People have failed to prove that Bryant voluntarily consented or that he willingly subjected himself to 11 hours of continuous questioning.* An understanding of the situation Bryant faced when he first met the police is essential to determining whether his consent was voluntarily given. When he answered the door in the early hours of March 29, he was confronted by three police officers intent on investigating the death of a young girl. To the average person, but particularly an individual of limited intelligence, such a confrontation would be overwhelming, and the natural inclination would be to be co-operative and acquiesce in any reasonable demands of the police, including going to the police station to answer questions. Guilty or innocent, an individual naturally tends to defer to authority figures, and the specter of three policemen at a door can be awesome. It should also be noted that while the *Miranda* warnings may speak to a defendant's right to remain silent or to have a lawyer present, they do not themselves inform a defendant that he does not have to accompany policemen to a police station. From what Detective Chapman told him, Bryant knew he could remain silent, but not that he could refuse to accompany him to the police station. Although Bryant was not arrested in the formal sense, the purpose of the officers in seeking him out and asking that he go to the station house with them appears to be similar to that of the arresting officers in *Brown v Illinois* (422 US 590, 605), which the Supreme Court found disdainful, noting, "The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." Moreover, when Bryant left his apartment, the officers had not ascertained whether he understood the rights which had been read to him. This takes on added importance in light of his limited intelligence. And after he was brought to the station, he remained in the same squad room for 11 hours, questioned by many different officers, before he made a statement which involved him in the crime. The police conceded that had Bryant sought to leave during the questioning, he would not have been permitted to do so. The People argue that even if the original detention were involuntary, the confessions eventually elicited from Bryant were

---

* Bryant did not testify at the suppression hearing. He did testify at trial, however, and stated that he went to the precinct voluntarily. This was not evidence before the suppression court, but more importantly would have been the only plausible trial posture. Had he testified that he went to the police station against his will, a natural conclusion for the jury to draw would be that his refusal to accompany the police meant that he had something to hide.

sufficiently attenuated by the intervening time period and the repetition of the *Miranda* warnings throughout the questioning, so as to dissipate the taint of any initial illegality. Thus, they argue, the statements were the product of free will. But the United States Supreme Court in *Brown v Illinois, (supra,* p 603) has held that "the *Miranda* warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." The length of time between the officers' request that Bryant accompany them to the precinct and the confession did not dissipate the taint, but rather compounded it, since the passage of time served only to weaken the questionable will power of a suspect who had repeatedly denied involvement. The extensive confinement here cannot be justified by claiming that it occurred during the course of an investigation. It is clear that the Fourth Amendment protections apply to more than the accusatory stage of police proceedings against an individual: "to argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *(Davis v Mississippi,* 394 US 721, 726-727.)* As already noted, the suppression court relied, in part, on a finding "that the police had a reasonable suspicion to initially question the defendant". In *People v Morales* (42 NY2d 129, 135, *supra),* the Court of Appeals stated that "Law enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights." It is clear, however, in light of *Dunaway v New York (supra),* that reasonable suspicion can no longer justify a custodial interrogation. It is of consequence also, however, that even if *Morales* were still the rule, the length of the confinement here was not "a reasonable and brief period of time". Eleven hours cannot be equated to the 15-minute period before Morales confessed to the murder. In addition, in *Morales,* the encounter between defendant and the police was instigated by a call from the defendant. Here, the police came to Bryant without any prior communication. Accordingly, the judgment, Supreme Court, Bronx County, rendered October 25, 1976, convicting defendant of, *inter alia,* three counts of murder in the second degree, should be reversed, the statements suppressed and the matter remanded for a new trial.