OPINION OF THE COURT
Stanley L. Sklar, J.
The principal issues presented on this application to suppress statements made by the defendant, John Lawson, at a time when he claims to have been in custody are: (1) what circumstances, in this case, must be considered in determining whether Lawson was in custody, and (2) in particular, what is the effect on that determination of the circumstance that Lawson was required by his employer, a governmental agency, to submit to interrogation.
*830 The conclusion is compelled, as a matter of fact, based on all the applicable circumstances, that Lawson was in custody when he was interrogated. Also, I hold as a matter of fact and law that he invoked his right to counsel.
An indictment has been filed against the defendant accusing him of the class B felony of robbery in the first degree. The charge is that on January 3, 1980, John Lawson forcibly stole money and subway tokens from the New York City Transit Authority.
FINDINGS OF FACT
John Lawson was a New York City subway token clerk. Lawson, while on duty with another token clerk, William McCarten, was robbed by a black male vyith a gun.
Transit Authority detectives, as a result of an investigation they conducted, concluded that Langston Austin was the robber. They also concluded that Lawson had conspired with Austin to effect the robbery, so that the robbery was sham so far as Lawson was concerned.
The detectives conferred with an Assistant District Attorney. A determination was made to arrest Lawson. However, arrangements were made to conduct a lineup in which Lawson, and other token clerks, would be asked to view Austin and stand-ins. Also, arrangements were made to have Lawson interrogated after the lineup and before his arrest.
Detective Clair contacted Lawson’s supervisor to arrange his availability (during Lawson’s working hours) for the lineup. On July 15, 1980, at about 10 p.m., Detectives Clair and Gonzales went to the token booth where Lawson was then working. Lawson’s supervisor was at the booth. Clair introduced himself and told Lawson that they would like him to view a lineup concerning the robbery. Lawson agreed.
Clair testified that Transit Authority rules required Lawson’s co-operation during his working hours. He also testified that he would have arrested Lawson on the spot, if he had refused to accompany them.
Clair and Gonzales took turns in remaining near the token booth for about 30 minutes while Lawson’s supervi *831 sor arranged for another clerk to take over Lawson’s duties. They then took Lawson in their department auto to Transit Authority headquarters at 370 Jay Street, Brooklyn, where they had him wait, with a group of other token clerks, for the lineup. Clair did not recall any police guard supervising the group. Accordingly, if Lawson had decided to leave, he would have been able to do so.
The lineup consisted of five stand-ins, and Austin. The stand-ins had been solicited from the streets of Brooklyn. When Lawson viewed the lineup, he said that he recognized Austin, whom he called by his nickname, “Sweet-pea”, from the streets. However, he said that Austin was not involved in the robbery. He said he recognized the stand-ins from the streets, but did not know their names.
Lawson rejoined the other token clerks after the viewing. About 20 minutes later, he was brought into an interrogation room, where he sat at a table with an Assistant District Attorney, Detective Clair and another detective. A third detective videotaped the interrogation. However, because of some unknown technical audio problem, the first 10 minutes of the conversation were not recorded. Nonetheless, it is clear that Miranda warnings were administered by the Assistant District Attorney. Lawson then advised the Assistant District Attorney that he was willing to talk with him without counsel. Lawson was not advised that he was the target of the investigation or that he was about to be arrested.
When the audio problem was corrected, and the conversation recorded, the Assistant District Attorney indicated that Lawson’s current statement contradicted an earlier statement he had given. Lawson responded to the effect that “If you’re going to do these changes, I’ll call my lawyer.” He continued talking for a moment. The Assistant District Attorney then continued the interrogation, continuing to focus on contradictions. About 15 minutes later, Lawson said, “I have to get my lawyer on this.” The interrogation continued for an additional eight minutes, when Lawson said that he wanted counsel. Interrogation then stopped and Lawson was formally arrested.
CONCLUSIONS OF LAW
I make the following conclusions of law:
*832 Lawson contends that his statements made at the lineup must be suppressed because they were the product of custodial interrogation before receiving Miranda warnings. He also urges that his statements made during his interrogation must be suppressed because, although questioned after Miranda warnings, his request for counsel was not respected. The People argue that Lawson was not in custody at the lineup or during the interrogation. They also contend that even if he were in custody during the interrogation, his right to counsel was respected.
In Miranda v Arizona (384 US 436, 444), the Supreme Court said that: “By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” The Supreme Court later declared, clarifying the scope of its decision in Miranda, that the “Miranda warnings” are not required in all police interrogations which occur in a coercive environment but only those in which a person is actually in custody, or otherwise deprived of his freedom of action in any meaningful way. (Oregon v Mathiason, 429 US 492, 495.) Accordingly, our first inquiry is whether Lawson was in custody at the lineup or at the interrogation.
CUSTODY
As just noted, Miranda warnings must be given, not only to one who' is physically restrained or formally arrested, but to one who has been deprived of his freedom in a significant way.
In Miranda, the court explained the nature and setting of custodial interrogation, as reflected in police training manuals, of isolating an individual in an unfamiliar police dominated atmosphere in which a statement may be induced by fear or other psychological motivation not necessarily consistent with a truthful fact-finding process. In People v Rodney P. (21 NY2d 1, 9), our Court of Appeals approvingly quoted the following language of a California decision. “ The vice of the custodial interrogation * * * [lies] in the psychological coercion implicit in interrogation in the isolated chamber from which the suspect may rea *833 sonably believe he cannot leave. In such circumstances the person detained or arrested finds himself completely and suddenly cut off from freedom of movement. An involuntary immobilization by law enforcement officers dramatizes the fact that the individual stands suspected or accused of crime. Lacking knowledge of his constitutional rights, he may feel that he can extricate himself only by submitting to interrogation. He may reasonably believe that if he attempts to leave the interrogation chamber the authorities will impose immediate detention’ ”.
To effectuate the purposes of the Miranda rule, the Court of Appeals adopted, as the test of whether custody has occurred, whether “ ‘the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived.’ ” (People v Rodney P., supra, p 9.) In People v Yukl (25 NY2d 585, 589) the court declared, “In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought if he had been in the defendant’s position.”
The application of this test requires the making of a finding of fact. (People v Yukl, supra, p 588.) A conclusion as to whether the accused was in custody or not, may not, at least in the unexceptional case, be reached as a matter of law. (People v Palumbo, 49 NY2d 928.) The issue, presented recurrently, is often troublesome because no one factor is determinative. Rather, all of the circumstances of the case should be brought to bear on the issue. An entire spectrum of facts have been considered as relevant in this fact-finding task: some, in context, tending towards a finding of custody; others, in context, tending towards a finding that the suspect was not in custody.
PLACE OF QUESTIONING
For example, the place where the questioning occurs is a factor to be considered. The Miranda court stated that: “General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-
*834 finding process is not affected by our holding.” (Miranda v Arizona, 384 US 436, 477, supra.)
In one case, an individual was interrogated by the police, who did not have guns drawn, on the street in the familiar surroundings in front of his home. (People v Rodney P., 21 NY2d 1, supra.) In another the police interrogated a person suspected of criminal activity, in a brief street encounter near his home, with his friends nearby. (Matter of Kwok T., 43 NY2d 213.) United States v Shafer (384 F Supp 486) arose out of the tragic Kent State shooting incident. Immediately after the shooting, a general on-the-scene inquiry was made of the National Guardsmen as to whether they had discharged their weapons, how many rounds they had fired, and the nature of their targets.
In all of these cases, the courts held that the particular on-thé-street or on-the-scene investigations were noncustodial. (See, also, People v Liccione, 63 AD2d 305, affd 50 NY2d 850.)
On the other hand, the suspect may be questioned at a police precinct. Yet, questioning at a precinct does not necessarily mean that the suspect is in custody. (People v Yukl, 25 NY2d 585, supra, and cases cited therein; People v Korsing, 71 AD2d 628.) In the instant case, the lineup occurred at Transit Authority headquarters, a fact which, as contrasted with a showup or lineup at a token booth where the defendant is working, militates, however slightly, towards the custody end of the factual spectrum.
VOLUNTARY SCHEDULING AND GOING TO THE PLACE OF INTERROGATION
The manner in which the accused gets to the place where he is interrogated is also to be considered. In People v Yukl (supra, p 587), officers at the scene requested that Yukl and his wife accompany them to a precinct “ ‘because there were less disturbances.’ ” They did so voluntarily. In Oregon v Mathiason (429 US 492, supra) a parole officer left his card at a parolee’s residence with a note requesting the parolee to call the officer because he would like to discuss something with him. When the parolee called, the officer asked where it would be convenient for them to meet. The parolee had no preference, so the officer asked that they *835 meet at a State parole office later. Similarly, in United States ex rel. De Rosa v Superior Ct. of N.J. (379 F Supp 957), a prosecutor called a police chief and asked that he come to the prosecutor’s office. He complied with the request. In United States v Lewis (556 F2d 446), an accused postal worker contacted by postal investigators arranged to go to the postal inspector’s office at his convenience.
The courts held in all of these cases that the accused was not in custody when interrogated at the precinct or at the prosecutor’s office. (See People v Pugliese, 26 NY2d 478; People v Bryant, 71 AD2d 564, affd 50 NY2d 949.) On the other hand, a seizure of an individual and physically constraining him to go to a precinct is manifestly custodial. The large area between these two extremes is the focus of our concern.
The transporting of the accused to the interrogation chamber can be the equivalent of a physical seizure. In United States v Pellegrini (309 F Supp 250), a postal inspector confronted a postal worker who effectively confessed, to purloining certain coupons from the mail, which coupons he said were at his home. Two inspectors allowed the defendant to drive to his home to retrieve the coupons and drop off a young boy, and return to the post office. However, they closely followed the defendant in their car. The court held that the defendant was in custody when he was later questioned at the post office.
Yukl (25 NY2d 585, supra), Mathiason (429 US 492, supra), De Rosa (379 F Supp 957, supra) Lewis (556 F2d 446, supra) and other cases, involved suspects responding to telephonic or note requests that the suspect come to a place where he was questioned. A response of this nature involves an element of voluntariness, even though one may also consider a request from the authorities as a command for co-operation. The suspect is not confronted with the same sense of urgency as when peace officers, in person, suddenly advise him of the official request for his presence. (People v Byers, 71 AD2d 77, 80.) He is less likely to feel constrained if he is able to transport himself freely to the place of interrogation and especially so if he can select the time and/or the place of questioning.
*836 On the other hand, an immediate request for the defendant’s presence, and his being accompanied by peace officers, does not always, as in Pellegrini (supra), mean that the defendant is in custody. In People v Palumbo (49 NY2d 928, supra, rev 65 AD2d 443, on remand 79 AD2d 518) the accused director of leasing for the New York City Department of Real Estate, was stopped on his way to work in the morning, and was requested to accompany two detectives. His question as to whether he needed a lawyer was answered equivocally. He was brought to an interview in the office of the New York City Commissioner of Investigations. The commissioner, an Assistant District Attorney, an Assistant United States Attorney and an attorney employed by the Department of Investigations, along with two detectives, were present during interrogation. However, the accused was told several times that he was free to leave. The Court of Appeals held that a finding could not be made, as a matter of law, that the accused was in custody. On remand, the Appellate Division held that, as a matter of fact, the defendant was not in custody.
In People v Grant (80 AD2d 862) detectives involved in a murder investigation traveled in two cars to locate the suspect, who already had three encounters with the police on the matter earlier that evening. They found him driving his car and signaled for him to pull over. Two detectives approached from each side of the suspect’s car. They asked that he accompany them to the precinct. He “gladly agreed” because he had nothing better to do and because he was willing to co-operate. He rode with the detectives, and one of them drove his car to the precinct. The questioning started at 9 p.m. and ended with a confession at about 3:30 a.m. When he went to a bathroom during questioning, he was escorted by a detective. The court emphasized that the suspect was not told that he was free to leave. The majority of the Appellate Division, Second Department, concluded that the defendant was in custody during questioning.
FREE TO LEAVE
Telling the suspect that he is free to leave comes as close as any single factor could in establishing that an accused is not in custody. In Beckwith v United States (425 US 341), *837 two special agents from the Intelligence Division of the Internal Revenue Service went to an accused’s home. They advised him of most of the Miranda rights and conducted a friendly interrogation in which they did not press for answers. One of the agents asked to look at his records. The suspect indicated that the books were at his place of business. The agents met the suspect at his business and advised him, before the records were turned over, that he was not required to do so.
The Supreme Court noted that the accused was, in fact, the “focus” of an investigation, but, nevertheless found the interrogation to be noncustodial. Any compulsion derived from the focusing of a criminal investigation on a particular suspect was dispelled by the noncoercive atmosphere of the questioning.
The finding, on remand, that the suspect was not in custody in the Palumbo case (49 NY2d 928, revg 65 AD2d 443, on remand 79 AD2d 518, supra), appears to have turned principally on the fact that the accused was told that he was free to leave during the interrogation.
AN EMPLOYEE WHO MUST RESPOND TO QUESTIONS
All citizens have some obligation to co-operate with authorities investigating a crime. Yet, the average citizen can breach that obligation with legal impunity. His declination to respond to questions may stimulate the suspicions, or arouse the ire, of the police. Still, he can ordinarily refuse to co-operate without any perceived adverse legal consequence (People v Howard, 50 NY2d 583.)
Not so, however, when an employee is asked by his employer, or by personnel of an investigating unit of his employer, to answer questions about a crime. The employee of a small business surely knows that he can be fired on the spot if he leaves the interrogation room without permission or if he refuses to answer questions.
What is the meaning of the circumstance that, the suspect’s employer is a governmental unit or agency, so that the boss who interrogates is a police or investigatory division? The accused’s responses, if inculpatory, may result in a criminal prosecution and conviction as well as the loss of vested pension and other benefits. Yet the rules of *838 many governmental units require attendance by an employee, and co-operation in, such interrogation. If one attends an interrogation session in submission to such regulation, is he in custody?
The cases examined have not specifically discussed the force of a civilian governmental unit’s regulations in deciding whether an employee is in custody.
The impact of regulations has been discussed with respect to the military, where the regulations may have the greatest force. Military personnel may be in custody when there has been some assumption of control over their movements. “In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action.” (United States v Tempia, 16 USCMA 629, 636; accord United States v Shafer, 384 F Supp 486, supra.)
The two cases already discussed involving postal worker suspects, Pellegrini (309 F Supp 250, supra) and Lewis (556 F2d 446, supra), reached different results concerning an employee’s obligation to answer questions, the courts regarding other factors as being more critical in reaching a" decision as to custody.
Whether an employee reasonably believes himself constrained by his employer’s rules to remain in the interrogation room and answer questions or reasonably believes himself free to leave, resembles the issue of voluntariness. In Garrity v New Jersey (385 US 493), the Supreme Court held that a waiver by a suspect, who was a policeman, of his right to remain silent was involuntary when the officer was told that he might be discharged from his position if he invoked his privilege to be mute. Justice Douglas said (p 497): “The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent”. “Where the choice is ‘between the rock and the whirlpool,’ duress is inherent in deciding to ‘waive’ one or the other.” (p 498.) What is the reasonableness of a perceived freedom to leave, or a com *839 pulsion to remain in a room for questioning, if the employee’s position is reasonably believed to be at stake? In De Rosa (379 F Supp 957, supra), the court concluded that statements made by a police officer to his superiors were not involuntary because no one had specifically told the officer that he might lose his job if he failed to answer questions, that is, that the Hobson’s choice was not stated.
A recent decision, evidently of first impression in New York, dealt with the issue of whether statements of police officers to their superiors were rendered involuntary absent any express threat of dismissal simply because they knew, or should have known, that they could lose their positions if they failed to waive their right to remain silent. In People v Lannon (107 Misc 2d 996), the Supreme Court, Westchester County, reached the same conclusion as the De Rosa (supra) court.
In People v Williams (56 Misc 2d 837), a policeman was questioned at a police precinct about the alleged use of his car in a holdup. The court stated that the defendant, an experienced police officer, was as much at home at the precinct as a private citizen would be in his or her home. The court did not reach the Garrity (supra) issue.
The Garrity (supra) issue need not be treated here. However, it is clear that, in reality, a person employed by a governmental agency would have some reasonable apprehension about the loss of his position, or other difficulties, that would at least cause pause before determining that he was free to leave a room in which he was being questioned by representatives of the police or other investigative arm of his governmental employer.
OTHER FACTORS
It would be impossible to list all of the other factors that a reasonable person would use in determining whether he was free to leave or whether his freedom of action was restricted in any significant way. The cases have considered: the nature of the questioning — whether it was vigorous and pressing or friendly (Beckwith v United States, 425 US 341, supra; People v Korsing, 71 AD2d 628, supra); whether the atmosphere was police dominated (People v Anderson, NYLJ, Oct. 30, 1973, p 2, col 1); *840 whether the atmosphere was coercive (Oregon v Mathiason, 429 US 492, supra; People v Jones, 47 NY2d 528); whether the person being questioned was the focus of the investigation (United States v Thompson, 463 F2d 1258; People v Pugliese, 26 NY2d 478, supra; People v Camacho, 103 Misc 2d 791; People v Matkowski, 67 AD2d 1087); and whether Miranda warnings were administered (United States v Akin, 435 F2d 1011, cert den 401 US 1011).
THE LINEUP
Having reviewed these factors as discussed by some of the cases, I now turn to the lineup. I find, as a matter of fact, that the suspect, John Lawson, was not in custody at the time of the lineup. True, he was summoned by New York City Transit Authority detectives to appear forthwith, they did take turns in waiting for him at his token booth, they did accompany him to transit headquarters, he was obligated to accompany them during working hours, and they did intend to arrest him. However, both detectives did not remain with him while his supervisor arranged for someone to take over his work, no urgency was expressed, no one ma.de any statement that he was or was not free to leave. He was not requested to come with the officers for interrogation, but to view a lineup. Accordingly, he did not appear to be the target of the investigation. While waiting, he was with about 15 other token clerks who had been summoned, thus reinforcing a lack of apparent focusing on Lawson. No guard stood in the waiting room, so that presumably, despite the intent of the detectives, he was actually and apparently free to leave. There was no police dominated atmosphere, nor any coercive feature to the conduct of the lineup. In short, he was not in custody.
THE INTERROGATION
The situation changed dramatically when he was summoned into a separate room for interrogation. As just noted, he had been summoned by two detectives to appear at once; he was not left alone while waiting for a replacement. He was summoned during working hours, although it is not known whether he specifically realized that he had to attend rather than thinking, as most employees would, *841 that he must attend. He went through the normal procedure of a lineup, together with many others, but now matters had changed. Although not sufficient to amount to custody initially, the factors listed above, coupled with the rapidly escalating circumstances listed below, created a situation in which a reasonable person, innocent of any crime, would have thought himself to be in custody. He was separated from the other token clerks. He was taken to a separate room where he was confronted by three New York City Transit Authority detectives, and by an Assistant District Attorney. One of the detectives recorded the interrogation on a videotape. The room was smallish; the atmosphere was police dominated. Miranda warnings were given to him.
Moreover, unlike Beckwith (425 US 341, supra), he was not told he was free to leave. He was questioned by an Assistant District Attorney, rather than a Transit Authority detective. Although the District Attorney’s questions were honorable, they were searching and vigorous. He was being confronted with contradictions between his present version of the robbery and his earlier version.
I find, as a matter of fact, that Lawson was in custody at the time of his interrogation.
(The balance of the opinion, holding that Lawson indicated, at the start of the sound-recorded interrogation, that he wanted counsel, and that his request was not honored, has been deleted for purposes of publication.)
The motion to suppress is denied with respect to the statements made by the defendant at the lineup and granted with respect to statements made by the defendant as recorded by videotape.