**UNITED STATES of America,**

v.

**Wilfredo SANTIAGO, Defendant.**

**No. 13 CR 39(CM).**

United States District Court,
S.D. New York.

Aug. 13, 2013.

A. Damian Williams, Katherine Rachel Goldstein, U.S. Attorney's Office, New York, NY, Matthew C. Singer, United States Department of Justice, Washington, DC, for United States of America.

Andrew John Finn, Philip L. Weinstein, Federal Defenders of New York Inc., James R. Devita, Annalisa Miron, Federal Defenders of New York, Denise R. Rosenhaft, New York, NY, for Defendant.

## DECISION AND ORDER DIRECTING A HEARING ON DEFENDANT'S MOTIONS TO SUPPRESS AND TO DISMISS INDICTMENT

McMAHON, District Judge:

Wilfredo Santiago is charged with one count of reckless assault in violation of 18 U.S.C. § 113(a)(6), and two counts of making false statements in violation of 18 U.S.C. § 1001(a)(2). The assault charge stems from the 2008 shooting of Michael Carpeso (at the time, a Navy Corpsman) by Santiago (at the time, a corporal in the United States Marine Corps) while the two men were serving together in the same fighting unit in Iraq. The allegedly false statements were made to a Lieutenant who was conducting a Line of Duty ("LOD") investigation and to the Naval Criminal Investigative Service ("NCIS") agents, to whom Defendant subsequently admitted being the shooter.

Defendant has moved to suppress the statements he made to his Lieutenant and to NCIS investigators, on the ground that such statements were obtained in violation of Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831 ("Article 31") and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant also seeks dismissal of the Indictment on the ground that the Marine Corps and the United States Department of Justice intentionally delayed prosecution to gain a tactical advantage and deprive him of "favorable rights" under Article 31. (Deft. Memo at 17).

The court finds this case troubling, and the Government's response to my inquiries has done little to mitigate my unease. Defendant was plainly amenable to court-martial for this shooting (which no one suggests was anything other than accidental). He was a serviceman stationed in a war zone, who admitted discharging a weapon that seriously injured another serviceman. At first, he denied to investigating officers that he discharged his weapon. These are offenses under the Uniform Code of Military Justice (UCMJ). Defendant's commanding officer had the absolute right to choose to prosecute—or to

impose discipline short of prosecution pursuant to Article 15 of the UCMJ—or to treat the matter in another fashion.

Defendant was not court-martialed. The Government represents that the convening authority had in fact decided to prosecute, but intended that the court-martial be convened after Defendant returned to the United States, only to have the matter fall through the cracks due to "a communication breakdown within the Marine Corps." (Govt. letter to Court dated March 8, 2013). The Assistant United States Attorney is of course not competent to testify about such matters, and I cannot accept his evidentiary statement in the absence of sworn testimony to back it up—particularly because (based on the limited information available to me at this time and a modicum of research into the military law) it appears that Santiago may not have been apprised of his Article 31 rights (including his right to remain silent) in a timely fashion. If true, both his statement to his Lieutenant and his subsequent admission to NCIS agents might well be inadmissible at a court-martial. Were that the case, the Corps—lacking an eyewitness who could testify that Santiago behaved recklessly—might have concluded that successful prosecution was impossible. In this civilian court, where Article 31 (a stringent rule whose protections kick in at a much earlier point than *Miranda v. Arizona*) does not apply, any such difficulty evaporates.

How this court became involved, in 2013, in an internal military matter involving conduct committed in Iraq in 2008, is its own conundrum. The Government claims jurisdiction under the Military Extraterritorial Jurisdiction Act (MEJA), 18 U.S.C. § 3261—a statute passed to fill in a "jurisdictional gap" that left extraterritorial crimes committed principally by persons who were never subject to the UCMJ, such as civilian dependents and military contractors, unprosecutable. This court has culled through cases brought under MEJA since its passage; I have located only three cases brought under MEJA against a former serviceman, and this is the first indictment of a former serviceman for conduct known to military authorities while the defendant was amenable to court-martial. The parties have not come to grips with the issue of whether MEJA jurisdiction extends, or was intended to extend, to a serviceman whose alleged crimes were known to, and could have been prosecuted by, the Marine Corps during his term of service.

Finally, in order to decide the motion to dismiss the indictment in this case of first impression, it is imperative that the court understand why Defendant was not court-martialed (put otherwise, what that "failure of communication" really was). Due to the resulting delay, Santiago has lost the ability to call as a witness the only person who was in the room with him and Carpeso, and who saw exactly what happened. No less an authority than the United States Supreme Court has held that a due process challenge to a delayed indictment can only be decided after analysis of the reason for the delay; the record needs considerable amplification, both factual and legal, before I can consider and rule on Defendant's motion to dismiss the indictment.

*Background*

The Government expects the evidence to show the following:

In January 2008, Santiago was stationed at Camp Echo in Iraq. There were approximately fifteen men in Defendant's team. They were assigned to periodic rotations at a Marine outpost in Ad Diwaniyah, Iraq (the "Outpost"). Michael Carpeso, a Navy Hospital Corpsman and the only non-Marine, was the team medic.

On January 26, 2008, Carpeso and Defendant traveled to the Outpost, where team leader Captain Benjamin Drude, First Lieutenant Blair Cellon, and a local Iraqi interpreter known as "Hollywood" were located. That day, Defendant, Cellon, and Hollywood went out on a mission with local Iraqi soldiers. Carpeso stayed in the trailer and provided radio support.

Prior to leaving, Cellon ordered Carpeso to turn over his M9 and three magazines so a local Iraqi soldier could use them on the mission. When the mission was complete, Cellon instructed Defendant to return Carpeso's M9 and magazines. Defendant entered the trailer and gave the M9 and magazines to Carpeso, who was sitting on a cot across from Hollywood. Defendant, Carpeso, and Hollywood were the only people in the trailer at the time.

As Carpeso bent down to place the magazines in his pants pocket, he heard a loud noise and was hit in the face. Carpeso did not initially think he had been shot; he thought an air conditioning unit had blown-up and hit him. In fact, a bullet from Defendant's M9 had struck Carpeso's head at close range. The bullet entered Carpeso's left temple, ruptured his left eye, traversed his nasal cavity, and exited through his right cheek. The bullet then pierced the wall of the trailer, ricocheted only feet away from another Marine who was walking toward the trailer, and rested in a barrier that was meant to protect the Outpost from external attack.

Moments after Carpeso was shot, Captain Drude went to the trailer and found Carpeso crouched down on the floor. Drude asked what had happened; Santiago told Drude that Carpeso had shot himself. Drude does not recall that Carpeso contradicted Santiago at the time.

Santiago, Cellon, and Drude rushed Carpeso back to Camp Echo, where Carpeso was medivaced to a hospital for surgery. When the transport was complete, Cellon and Drude took a team, including Santiago, back to the Outpost to clean up the trailer. Cellon took photos of the trailer prior to cleaning it.

*Statements to Lieutenant Wang*

That same evening, Drude assigned First Lieutenant David Wang ("Wang") to conduct a preliminary administrative inquiry in order to determine whether Carpeso was entitled to receive certain benefits. This is what is known as a "line of duty/misconduct" inquiry; its purpose is to ascertain whether the injury was received in the line of duty and whether it resulted from misconduct on the part of Carpeso, the injured party. It is not a criminal investigation.

Wang has filed a declaration under oath with this court, averring that he was told Carpeso had shot himself, and he was ordered to determine whether Carpeso had done so deliberately or accidentally. (See Declaration of David Wang ("Wang Decl.") at ¶ 3.)

On January 27, 2008, the day after the shooting, Wang personally interviewed all persons with knowledge about the incident (Defendant, Carpeso, Drude, Cellon, Hollywood, and Carpeso's treating physician) and obtained their written statements (Wang Decl. at ¶ 5.) Before interviewing Santiago, Drude, and Cellon, Wang advised them of their Privacy Act rights. He told them that their statements were voluntary and that information they provided would not be kept confidential. All three signed a form acknowledging this warning before giving any oral or written statement. (See Wang Decl. at ¶ 6.) All three servicemen were armed during the interviews and were, according to Wang, free to leave his presence at any time. (*Id.* at ¶ 7)

During his interview, Santiago told Wang that he was walking to his cot when

he heard a gunshot. He turned around and saw that Carpeso was shot:

As I was moving to my rack I heard [a] gunshot. I did not hear a chambering of a round or anything like that. After I heard the round go off, I turned around saw [sic] blood coming from his face, turned around to get a pressure dressing from my IFAK.

(Govt. Ex. C.) According to Wang, Defendant was calm and forthright during the interview. (Wang Decl. at ¶ 8.)

Prior to interviewing Defendant, Wang began to suspect that Santiago may have shot Carpeso. (Wang Decl. at ¶ 8). Nonetheless, Wang neither called a halt to his LOD investigation nor gave Santiago so-called Article 31 ("military *Miranda*") warnings prior to questioning him. Such warnings are required whenever "a suspect or an accused is questioned by a military superior during an official law enforcement investigation or disciplinary inquiry." *United States v. Bradley*, 51 M.J. 437, 441 (C.A.A.F.1999), *citing United States v. McLaren*, 38 M.J. 112 (CMA 1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994); *United States v. Loukas*, 29 M.J. 385 (CMA 1990); *United States v. Moore*, 32 M.J. 56, 60 (CMA 1991). I do not purport to be an expert in the UCMJ, or the ways in which it differs from civilian criminal procedure law, and the parties have not briefed this issue; but my limited research suggests that the threshold for becoming a "suspect" is low, and that, as soon as it is crossed, Article 31 warnings are required. *See United States v. Swift*, 53 M.J. 439, 448 (C.A.A.F.2000) (noting the "relatively low quantum of evidence required to treat an individual as a suspect"). Wang candidly admits in his declaration that he suspected Santiago of shooting Carpeso, so the threshold appears to have been crossed—which, if true, means that Wang

should not have been questioning Santiago at all, or at least not without giving him Article 31 warnings.

Wang was unable to conclude definitively whether Carpeso shot himself accidentally; from the fact that he suspected Defendant of being the shooter, I gather that he was unable to determine whether Carpeso shot himself at all. So the Lieutenant recommended that his command conduct a further investigation. (*Id.* at ¶ 9.) Wang also recommended that NCIS Naval *Criminal* Investigative Services—be tasked with investigating which weapon fired the round that hit Carpeso. (*Id.*)

On January 28, 2008, the case was referred to NCIS for further investigation.

*Statements to NCIS*

Prior to February 4, 2008, NCIS Special Agents Shawn Dorsey and Steven Neher were assigned to investigate the Carpeso shooting. At the time they were assigned, Dorsey, at least, was not told that Santiago was a suspect. However, as a result of his investigation—which apparently revealed that Santiago had a habit of "quick drawing" and "dry firing" his M9 service weapon—Dorsey concluded that Santiago was a suspect. (I have no idea whether Wang conveyed his suspicions to Dorsey; in view of the fact that he questioned Defendant without giving him Article 31 warnings, he may have chosen not to volunteer them).

On February 4, 2008, Dorsey and Neher interviewed Defendant about the shooting. (*See* Declaration of Shawn Dorsey ("Dorsey Decl.") at ¶ 4.) Santiago arrived at the interview without an escort; he was not handcuffed or restrained in any way.

Dorsey created a time line during the interview. At 1:48 PM, prior to any questioning, Defendant was advised of his rights pursuant to Article 31 of the Uniform Code of Military Justice (UCMJ), including (1) his right to remain silent and

make no statement about the offense of which he is accused or suspected; (2) his right to consult with an attorney prior to questioning; (3) his right to terminate the interview at any time, for any reason; and (4) the fact that any statement made by him may be used as evidence against him in a trial by court martial. (See Dorsey Decl. at ¶ 7.) Santiago initialed his acknowledgement that he had been advised of each right and executed a written waiver of those rights at 1:55 PM. (*See* Dorsey Decl. at ¶ 8; Gov't. Ex. C. (Time line); Gov't. Ex. D (Executed waiver of rights form).)

NCIS agents then asked Defendant what occurred on the night of the shooting. (Dorsey Decl. at ¶¶ 8–9.) In response, Defendant provided a virtually identical account to the one previously given to Wang. (*Id.* at ¶ 9.) Believing, based on the results of his investigation, that Santiago's statement was false, Dorsey confronted Defendant with facts indicating that Carpeso had not in fact shot himself. At 2:05 PM, Defendant admitted shooting Carpeso. (*Id.* at ¶¶ 10–11.) He also admitted that he had not been forthcoming in his written statement to Wang. (*Id.* at ¶ 12.) At 2:45 PM, Defendant provided a sworn statement, drew a sketch of the shooting, and agreed to go back to the trailer to demonstrate everyone's position at the time of the incident. (*Id.* at ¶¶ 13–14.)

In his written statement to NCIS agents, Defendant claimed he was attempting to clear his weapon and it accidentally discharged:

> I took my issued M9 pistol out of the thigh holster on my right side, and attempted to clear the weapon while facing the right side of the container … I began to clear the weapon by removing the magazine, and placing the magazine in my holster. After I did so, I pulled the slide back, and let it go forward. I thought the chamber of the weapon was empty, but right after I let the slide go forward, the weapon went off. I think it is possible I did not pull the slide fully to the rear, which would have ejected the round, and I think pulling it to the rear cocked the hammer of the weapon. I looked down at the weapon after the round went off, and saw the safety was on the "fire" setting.

(Ex. E.) Defendant further explained why he had lied to Wang:

> Wang was appointed as an investigating officer, and asked each of us who were at [the Outpost] during the incident to provide a statement of what had occurred. I provided a hand-written statement, which related to the above events, with the exception that I said I had my back turned, and that I did not say that my weapon had gone off. I didn't include it in my statement because I was scared of the reactions of my fellow team members, and of the consequences.

(*Id.*)

NCIS agents re-interviewed Defendant on February 5, 2008. After reminding him of his Article 31 rights, which Santiago again waived (Dorsey Decl. at ¶ 15.), NCIS agents asked Defendant whether he had quick drawn his M9 prior to shooting Carpeso. (*Id.*) Defendant denied quick drawing his M9. (*Id.*)

Santiago insists that Dorsey and Neher told him he needed to "come clean" or he would be severely punished before reading him his Article 31 rights at the first NCIS interview. (Santiago Decl. at ¶¶ 10–11.) "They said they knew my earlier statement was a lie and it would be 'voided' if I told them the truth." *Id.* at 11. Santiago then explained to the officers why he lied to Wang and admitted that it was "my weapon that discharged the bullet which

injured Carpeso." *Id.* Santiago says that "at the conclusion of the questioning that lasted about 20 minutes, I signed some 'paperwork' that the agents never reviewed with me." *Id.* I assume that this "paperwork" included the waiver of rights form.

### The Instant Indictment

Santiago completed his tour in Iraq the spring of 2008. He was discharged from active duty in the USMC upon his return to the United States and became a member of the Individual Ready Reserve until June 2011, when he received an honorable discharge from the Marine Corps. Until that moment, Santiago was subject to the Uniform Code of Military Justice.

The United States Attorney's Office represents that, at some unspecified point in time, the NCIS and the Staff Judge Advocate's Office asked the Department of Justice to determine whether Defendant should face criminal charges for his conduct pursuant to the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. §§ 3261 et seq. A decision in the affirmative was made, and on January 17, 2013, an indictment was handed down, alleging that Santiago shot Carpeso as a result of Santiago's reckless handling of his M9 pistol. As noted above, the indictment also charges Santiago with two counts of violating § 1001.

As proof of recklessness, the Government says that the evidence at trial will show, *inter alia*, that: (1) in the week prior to the shooting, Santiago was quick drawing his M9 and dry firing (pulling the trigger with no bullets in the weapon) at Carpeso and other team members' heads and torsos; (2) on one occasion (apparently not on the day of the actual shooting), Santiago appeared to load a magazine into his M9 and rack the slide (pull it back), then pointed the gun at Carpeso's head and dry fired, using only his pinky finger

as a bumper to prevent a round from being chambered; and (3) the day before the shooting, Defendant pointed his M9 at a fellow marine after that marine interrupted Defendant's conversation; when the marine reflexively grabbed Defendant's arm so that the M9 would be pointed up, Defendant dry fired the weapon multiple times. There were only three witnesses to the actual shooting—Defendant, Carpeso and "Hollywood" and to this court's knowledge, none of them has ever given a statement to NCIS indicating that Defendant dry fired his weapon at the time Carpeso was wounded.

### MEJA

The Military Extraterritorial Justice Act provides, in pertinent part:

(a) *Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States—*

(1) while employed by or accompanying the Armed Forces outside the United States; or

(2) *while a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice), shall be punished as provided for that offense*

(b) No prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General (or a person acting in either such capacity), which function of approval may not be delegated.

(c) Nothing in this chapter may be construed to deprive a court-martial, military commission, provost court, or other military tribunal of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by a court-martial, military commission, provost court, or other military tribunal.

(d) *No prosecution may be commenced against a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice) under this section unless—*

(1) *such member ceases to be subject to such chapter;* or

(2) an indictment or information charges that the member committed the offense with one or more other defendants, at least one of whom is not subject to such chapter.

18 U.S.C. §§ 3261 (Emphasis added).

MEJA was enacted just 12 years ago, in 2001, in order to close what the United States Court of Appeals for the Second Circuit correctly identified as a "jurisdictional gap" that allowed certain crimes committed on U.S. military posts or in theatres of war to go unpunished because they could not be prosecuted in any court.

The immediate impetus for MEJA was the Second Circuit's decision in *United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000). The defendant in that case sexually assaulted his stepdaughter in the family's home on a military base in Germany, where the defendant's wife, a member of Armed Forces, was stationed. Her husband, a civilian, was not subject to military jurisdiction; German authorities had no interest in prosecuting a crime committed by a U.S. citizen that took place on U.S. property.

The defendant had last resided in the Eastern District of New York, so the U.S. Attorney's Office in that District indicted Gatlin; it theorized that his crimes had been committed within the special maritime and territorial jurisdiction of the United States, 18 U.S.C. § 7(3). The defendant pleaded guilty but appealed his conviction on jurisdictional grounds, and the Second Circuit overturned Gatlin's conviction, ruling that 18 U.S.C. § 7(3) did not give a United States District Court jurisdiction over conduct committed outside the United States. Pointing out the "jurisdictional gap" that allowed criminal conduct committed outside the United States on military posts and in theatres of war to go unprosecuted unless the perpetrator was subject to the UCMJ, the Second Circuit forwarded its opinion to the United States Senators from New York. MEJA followed hard on the decision's heels.

This case is the antithesis of *Gatlin*. Here, there is no "jurisdictional gap" to fill; Santiago was a military man, and whatever he did was done while subject to the UCMJ and the authority of his commanding officer.

MEJA's text indicates that servicemen and women who commit crimes while on active duty are to be prosecuted under the UCMJ; indeed, 18 U.S.C. § 3261(d) specifically prohibits the use of MEJA to try active duty service personnel who are subject to court-martial, unless the serviceman or servicewoman committed the crime with someone who was not subject to UCMJ jurisdiction. This result is supported by the MEJA's legislative history:

Subsection (d) limits prosecutions under new section 3261 against persons who, at the time they committed the crime, were members of the Armed Forces. The committee recognizes that the military has the predominant interest in disciplining its members and subsection (d) enacts the general preference that mili-

tary members be tried by court-martial for their crimes.

See, H.R.Rep. No. 106–778(I) (2000), 2000 WL 1008725, at *16.

A statistical analysis of MEJA prosecutions prepared by the Department of Defense, Joint Services Committee on Military Justice, dated June 30, 2010 (the most recent such analysis the court was able to get its hands on), suggests that the decision to prosecute Santiago in this court using MEJA is unprecedented. Any prosecution at all under MEJA is rare: As of July 30, 2010, only 116 potential MEJA cases had been referred to the DOJ, and only 35 were prosecuted. This court has reviewed decisions in fifteen reported cases that were brought under MEJA; my research reveals that the statute has been used almost exclusively to prosecute persons who were never subject to UCMJ jurisdiction in the first place—civilian contractors and civilian family members of military service personnel, like Gatlin, whose conviction inspired its passage.[1]

We have located only three cases in which former service members were indicted using MEJA, and none presents a fact pattern remotely like this one.

In *United States v. Williams*, 825 F.Supp.2d 117 (D.D.C.2011), the defendant prosecuted under MEJA was not subject to UCMJ jurisdiction at the time he committed the crime charged in the indictment. Williams was medically discharged from service on May 3, 2005. On July 3, 2005, he participated, with members of the United States Army and Air Force stationed at Ramstein Air Force Base in Germany, in a hazing ritual (called a "jump in") to initiate Sergeant Juwan Johnson into a gang. *United States v. Williams*, 825 F.Supp.2d 128, 139–40 (D.D.C.2011). Johnson died from injuries sustained during the hazing. Had Williams not been honorably discharged two months before he participated in the hazing incident, he would have been court martialed and sentenced under the UCMJ; that is what happened to the other participants.[2] In-

---

1. *See e.g., United States v. Dwain D. Williams*, 722 F.Supp.2d 1313 (M.D.Ga.2010) *aff'd*, 509 Fed.Appx. 899 (11th Cir.2013) (Prosecution of husband residing with Airman wife on American Air Force Base in Okinawa, Japan, for rape of step-daughter authorized under MEJA); *United States v. Brehm*, 1:11–CR–11, 2011 WL 1226088 (E.D.Va. Mar. 30, 2011) *aff'd*, 691 F.3d 547 (4th Cir.2012) (Knife attack at Kandahar Airfield, Afghanistan by civilian defendant, a citizen of South Africa, employed by civilian contractor for the DoD, properly prosecuted under MEJA) *cert. denied*, —— U.S. ——, 133 S.Ct. 808, 184 L.Ed.2d 596 (2012); *United States v. Arnt*, 474 F.3d 1159 (9th Cir.2007) (Prosecution of civilian wife for fatally stabbing husband—Army Staff Sergeant on Incirlik Air Base, Turkey, proper under MEJA); *United States v. Drotleff*, 497 Fed.Appx. 357 (4th Cir.2012) (Murder prosecution of employees of military contractor based in Afghanistan appropriate under MEJA) *cert. denied*, —— U.S. ——, 133 S.Ct. 1743, 185 L.Ed.2d 800 (2013).

2. The Court's belief that *Williams* is one of the two "former service member" cases cited in the DoD's statistics is predicated on former assistant Attorney General Lanny Breuer's statement to the Senate Judiciary Committee on May 11, 2011. During his testimony, Mr. Breuer summarized the types of cases that have been prosecuted under MEJA:

 Since MEJA was enacted, the Justice Department has successfully prosecuted numerous MEJA cases involving former Department of Defense employees or individuals accompanying them overseas. In *United States v. Steven Green*, for example, the Justice Department secured a conviction in Louisville, Kentucky against a former Army soldier for the brutal rape and killing of a 14–year old Iraqi girl and the murders of three of her family members while the soldier was on active duty in Iraq. In *United States v. Rico Williams*, the Justice Department obtained a conviction in the District of Columbia against a former Air Force senior airman for a gang-initiation beat-

stead, Williams—who otherwise would have fallen through the "jurisdiction gap"—was prosecuted successfully in a civilian court. Significantly, the "committed with" prong of MEJA was not invoked to bring the defendants who were still subject to court-martial before a civilian tribunal along with Williams; that is consistent with the views expressed in the House Report.

*United States v. Green*, 654 F.3d 637 (6th Cir.2011) *cert. denied*, ⸺ U.S. ⸺, 132 S.Ct. 1056, 181 L.Ed.2d 774 (2012) is the only reported case we have located in which the defendant was a serviceman subject to UCMJ jurisdiction when he committed his crime, but was subsequently charged under MEJA. On March 12, 2006, Private Steven Green, together with four other members of his unit, participated in the rape of a fourteen year old girl and the murders of multiple civilians near Al–Janabi, Iraq. When asked about the incident by his sergeant, Green replied, "I killed those people." An investigation was commenced into the incident, but the sergeant never told anyone about Green's admission. The investigators concluded that the crimes had been the work of Iraqi counterinsurgents.

Two months later, on May 16, 2006, Green was mustered out of the Army, receiving an "honorable discharge due to a personality disorder." Some weeks later, a private in Green's unit revealed that American soldiers had perpetrated the atrocities of March 2006; this information *was* conveyed up the chain of command, and a formal investigation by United States Army Criminal Investigation Division (CID) ensued. It ended with the court-martial of the four perpetrators who were still in the Army; they were convicted by plea, dishonorably discharged and sentenced to lengthy terms, albeit with the possibility of eventual parole. The prosecution by court-martial of the active duty servicemen was in keeping with MEJA's obvious preference that individuals who are subject to court-martial be dealt with in the military justice system.

It was, however, too late to court-martial Green, who had been discharged from the Army before a convening authority became aware of his involvement in the matter. So the case was referred to a United States Attorney under MEJA, and Green was charged with a number of crimes, including murder and sexual assault. He was convicted and the district court sen-

ing that ended in the death of an Army Sergeant in Germany. And in *United States v. Dwain Williams,* we obtained a jury conviction in Valdosta, Georgia against an individual accompanying a military service member overseas for the aggravated sexual abuse of a child in Japan.

The Justice Department has also successfully prosecuted Defense Department contractors employed overseas. In *United States v. Christopher Drotleff, et al.,* for example, we obtained jury convictions in Norfolk, Virginia of two Department of Defense contractors for involuntary manslaughter of a civilian in Afghanistan. In *United States v. Sean T. Brehm,* we secured a conviction from a Department of Defense contractor on

charges of assault with a deadly weapon in Afghanistan. And in *United States v. Jorge Thornton,* we secured a conviction from a Department of Defense contractor for abusive sexual contact while working at a U.S. military Forward Operating Base in Iraq. We have also investigated and prosecuted non-Department of Defense contractors whose work related to "supporting the mission of the Department of Defense overseas."

While Mr. Breuer's characterization of Rico Williams as a former Air Force senior airman is accurate, it leaves the impression that Williams was an active service member when he committed his crime—which, of course, he was not—and was later prosecuted in civilian court.

tenced him to five consecutive life sentences.

Green appealed his convictions, claiming that the district court lacked jurisdiction to try him because he had not been validly discharged from the Army, and so never ceased to be subject to military law. Green also argued that MEJA was an unconstitutional violation of the separation-of-powers and non-delegation doctrines, as well as Green's equal protection and due process rights. The Sixth Circuit rejected all of Green's arguments and affirmed his conviction.

The court has identified another case, not officially reported, in which allegedly criminal conduct committed in Iraq was not known to military higher ups until after a serviceman's discharge: *United States of America v. Nazario,* No. 07 Cr. 127 (C.D.Cal.). There, the defendant was indicted for voluntary manslaughter and other crimes in connection with the death of four unarmed Iraqi detainees in Fallujah during a military operation involving house-to-house fighting. Nazario, like Green, left the Marine Corps before anyone suggested that he had done anything wrong; his alleged involvement came to light in 2006, a year after his retirement. Nazario was charged under MEJA and acquitted after trial.

The significant difference between the Green and Nazario cases and this one is obvious. In *Green,* thanks to a cover-up by a non-commissioned officer, no official who could have convened a court-martial knew about Green's involvement in criminal conduct outside the United States until he was no longer amenable to UCMJ jurisdiction. The same is true of Nazario. MEJA was passed to fill in a "jurisdictional gap"—and in these cases, there was a jurisdictional gap a mile wide. Here, by contrast, appropriate authorities in the Marine Corps—including Santiago's com-

manding officer, the appropriate "convening authority" for a court-martial—knew full well that Santiago shot Carpeso very shortly after the incident. The Marines (and NCIS) continued to know what Santiago had done for a full three and one half years thereafter, during which period he was continuously amenable to court martial. Indeed, if the Government is to be believed, a decision to court-martial him was made shortly after the incident took place.

As far as this court knows, Santiago's is the first case in which MEJA has been invoked to try a serviceman who was subject to court-martial, and known to be subject to court-martial, but who was not court-martialed—for reasons as yet unknown to the court—despite Congress' plain directive that active duty service personnel should be tried by court-martial, not in civilian courts. It is with the unprecedented nature of this prosecution firmly in mind that I turn to Defendant's motions.

*Motion to Suppress Statements*

Santiago seeks to suppress the statements he made to the Marine Corps and NCIS on the grounds that such statements were obtained in violation of Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831 ("Article 31") and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Article 31*

 The failure to advise Santiago of his rights pursuant to Article 31 of the UCMJ (assuming there was such a failure) cannot be used as the basis of a motion to suppress, because Article 31 does not apply to a trial in a civilian court.

Article 31(b) provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected

of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in **a trial by court-marital.**

Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831 (2006) (emphasis added). Federal courts have strictly construed Article 31 to apply only to evidence in trials by court-martial and have refused to expand its reach to federal civilian court proceedings. *See Manning v. United States,* No. 05–00491–JMS, 2010 WL 2076095, at *5 (D.Haw. May 24, 2010) ("Prevailing view embraces strict statutory construction, and Article 31's plain language limits its application to military forums") (citation and internal quotation marks omitted); see also *United States v. Newell,* 578 F.2d 827, 832–833 (9th Cir. 1978) (Article 31 does not "purport to apply to federal court proceedings."); *United States v. Singleton,* 600 F.2d 553, 555 (5th Cir.1979) ("[B]y its terms [Article 31] is limited to evidence used in a trial by court-martial."). The reluctance to import Article 31 into federal civilian court reflects the longstanding principle, articulated by the Supreme Court, that "Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *see also Newell,* 578 F.2d at 832 ("The right to counsel of a person prosecuted in federal court, and the remedies for the violation of this right, are controlled by federal civilian law, not by the Uniform Code of Military Justice.").

In nearly all the cases cited by Defendant, federal district courts have refused to apply Article 31 to proceedings before them. (Def. Br. at 13–14 (*citing United States v. Baird,* 851 F.2d 376 (D.C.Cir. 1988); *Newell* ).) In *Baird,* the D.C. Circuit refused to apply Article 31 and took no position as to whether there were any circumstances in which its exclusionary rule could be applied in federal court. *Baird,* 851 F.2d at 384. And in *Newell,* the 9th Circuit flatly stated that Article 31 does not "purport to apply to federal court proceedings." *Newell,* 578 F.2d at 833. The Ninth Circuit refused to extend prior rulings that had excluded evidence in cases involving IRS agents who violated IRS regulations to military investigators, reasoning that "it would unnecessarily hinder the truth-finding process to adopt an exclusionary rule which would be of only remote and questionable deterrent effect on the conduct of military investigators." *Id.* at 834–835 (citations omitted).

The one arguable exception is found in a very old and very famous case, *United States v. Shafer,* 384 F.Supp. 486 (N.D.Ohio 1974)—the criminal case brought against the Ohio National Guardsmen who were accused of shooting students at Kent State University during the May 1970 anti-war protests. In *Shafer,* the district court suppressed some statements given by the accused Guardsmen to superior officers in the wake of the shooting but did not suppress others. It declined to suppress statements elicited immediately after the shootings by officers on the scene, reasoning that they were analogous to "on the scene" questioning by police that is exempt from *Miranda.* However, it suppressed statements given some hours later by Shafer and his co-defendants. Guardsmen who had admitted discharging their weapons during the "on-scene" questioning were told to report to the gymnasium annexed to the campus police station. There, they were ordered by superior officers (no civilian law enforcement personnel were present) to pro-

vide written accounts of what had transpired. The district court reasoned that, under military jurisprudence, "a request for a statement in the course of an official investigation by a person with authority over the accused is sufficient to trigger the need for Article 31 warnings which are the military cognate of *Miranda* warnings." *Id.* at 490, 86 S.Ct. 1602. Because no Article 31 warnings had been given, the court suppressed the written statements.

*Shafer* seems as factually close to this case as it is possible to get. Defendant's statement to Wang is at least arguably analogous to the initial statement that was not suppressed in *Shafer*, while Santiago's statements to NCIS agents—made after Wang recommended that a criminal investigation be commenced—are virtually indistinguishable from the statements made by Shafer and his co-defendants to their superior officers in the gymnasium.

Defendant argues that the *Shafer* district court applied Article 31 in a civilian proceeding. If indeed that is what the *Shafer* court did, I believe the case to have been wrongly decided; the plain language of Article 31 limits its applicability to courts-martial. However, I don't actually think that is what the judge in *Shafer* did. I believe he concluded that a violation of Article 31 was equivalent to a *Miranda* violation, such that the Article 31 violation automatically required suppression, not under the inapplicable UCMJ, but under *Miranda*. He did so by concluding that the defendants in *Shafer* were effectively "in custody" for *Miranda* purposes when they were questioned in the gymnasium. The *Shafer* court reasoned that "custody" for military personnel does not require the same level of restraint as it does for civilians, because " 'interrogation' takes on a far different meaning in a military environment, where any superior officer has the right to demand that his questions be answered." *Id.*

I happen to disagree with the *Shafer* court's conclusion that the defendants in that case were subjected to "custodial" questioning for purposes of *Miranda;* the reason for my disagreement will be discussed below. At this point, it is sufficient to conclude that Article 31 does not apply in criminal proceedings brought under the United States Code against civilians; *Miranda*, and only *Miranda*, does, and nothing in *Shafer*, properly read, is to the contrary.

Defendant's motion to suppress the statements he made to Wang and NCIS on the ground that they were obtained in violation of Article 31 is denied.

*Miranda v. Arizona*

Defendant also seeks to suppress the statements he made during the Navy's investigation on the ground that they were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

▮▮▮ The law is clear that *Miranda* warnings are required only when a suspect is actually "in custody;" even inculpatory statements made to law enforcement personnel outside of a custodial setting are admissible without any need for *Miranda* warnings. *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir.1992). In determining whether a suspect is in custody, courts look to a number of factors; ultimately the inquiry focuses on whether "there was a formal arrest or restraint on the freedom of movement of the degree associated with formal arrest." *Stansbury v. California*, 511 U.S. 318, 321, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The test is an objective one, which asks "whether a reasonable person would have understood herself to

be subjected to restrains comparable to those associated with a formal arrest." *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.1995) (citation omitted).

In other words, "custody for *Miranda* purposes is determined by: (1) inquiring into circumstances surrounding interrogation, and, given those circumstances, (2) determining whether a reasonable person would have felt he was not at liberty to terminate interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) and *Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

Defendant contends that a member of the armed services is "in custody" whenever he is ordered to appear at a certain place and make a statement to or answer questions from a superior. Defendant cites *United States v. Rogers*, 659 F.3d 74 (1st Cir.2011), as well as *Shafer*, in support of his argument. In *Rogers*, the First Circuit held that a naval officer was subjected to custodial interrogation when he was ordered by his commanding officer to report to his home, where law enforcement personnel were waiting to question him. The Court observed that "the most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily, or confront the police with free choice to be where he was." 659 F.3d at 78. The *Rogers* Court made it clear that the military command structure, and the psychological pressure it placed on the defendant, was the driving force behind its holding. *Id.* at 78–79.

I do not read either *Rogers* or *Shafer* to conclude that a member of the military is "in custody" within the meaning of *Miranda* every time a superior questions a subordinate, as Defendant suggests—and to the extent they can be so read, I dis-

agree with them, for reasons that will be outlined below. But the concerns expressed by the First Circuit are very real and must be kept in mind as we examine whether Santiago was "in custody" when he made the statements that he now seeks to suppress.

1. *The Interview with Lt. Wang*

The Government, not surprisingly, argues that Wang's interview with Defendant was non-custodial. As far as Defendant knew, Wang was conducting an administrative, not a criminal, inquiry. Although Defendant was not read his Article 31 rights before making statements (oral and written) to Wang, he was told that the participation in the interview was voluntary (albeit under the Privacy Act). Defendant has no quarrel with Wang's statement that Wang neither handcuffed nor otherwise restrained Santiago during the interview; indeed, Santiago remained armed during his one-on-one interview. (Govt Memo at 14–15, citing Wang Decl. at ¶ 7; Santiago Decl. at ¶ 8.) According to Wang, Santiago remained calm during the encounter and Wang did not accuse Defendant of any wrongdoing when they spoke. (Wang Decl. at ¶ 8.) The Government suggests that these are hardly the hallmarks of a custodial interrogation.

In the civilian world, I would agree with alacrity. But in a classically hierarchical institution like the military, where a subordinate has no choice but to obey the lawful order of a superior, a "reasonable person" in Defendant's position might well feel "coerced" to participate in what is described to him as a "voluntary" interview with a superior officer—even more "coerced" than a civilian feels when a police officer stops him and asks him questions. *See United States v. Baird*, 851 F.2d 376, 382 (D.C.Cir.1988) ("A member

of the military will feel coercion in circumstances in which a civilian will not.")

That does not mean, however, that every time a superior questions a subordinate in the military, the subordinate is "in custody" within the meaning of *Miranda*. *Rogers* does not go so far. *Rogers* involved a situation where a superior officer directed a subordinate to report to a location where he was unexpectedly confronted by "law enforcement officers" (not otherwise identified), who questioned him as part of a criminal investigation without telling him that he had a right to remain silent and not respond. Wang was not a "law enforcement officer;" he was a junior officer conducting an administrative inquiry. Furthermore, he told Santiago and the others that they did not have to speak with him—admittedly, not under Article 31, but because of the Privacy Act. On that basis alone, *Rogers* is distinguishable.

Neither does *Shafer* hold that every interview of a military subordinate by a superior officer is custodial in nature. In fact, *Shafer* plainly holds to the contrary. As discussed above, the district court denied the motion to suppress statements made by the defendants to their superiors in the "field" shortly after the shootings, concluding that such "general on the scene questions" fell outside the parameters of *Miranda*. *Id.* at 489. The district court did not specifically discuss whether that "on the scene" questioning qualified as custodial, but given the holding it is obvious that the judge did not believe it was.

Defendant effectively argues that his statement to Wang should be suppressed pursuant to *Miranda* because Wang violated what has been described as the "military cognate" of *Miranda* when he failed to provide Santiago with Article 31 warnings as soon as Defendant was suspected of criminal activity. *See Shafer*, 384 F.Supp. at 490. As I have already noted,

my cursory research into military jurisprudence suggests that Wang should indeed have provided Santiago with Article 31 warnings the second he developed the suspicion that Defendant was the real shooter. But it does not follow that Wang's failure to provide those warnings necessarily violated *Miranda*. It is there that I part company with the court in *Shafer*.

There are significant differences between the circumstances that trigger the requirements of Article 31 and those that trigger *Miranda*—difference that mirror the very real distinction between a serviceman's relationship to his superiors and a civilian's relationship with the police.

Article 31 warnings are required as soon as a serviceman is accused *or even suspected* of having engaged in conduct that violates the UCMJ. The military sets an extremely low threshold triggering Article 31—no custody required, no accusation required, mere suspicion is sufficient to trigger the requirement of warnings—in order to deal with the unique problem confronting servicemen and women, who, when questioned by a superior, are required to respond or face discipline. Receipt of Article 31 warnings relieves the subordinate of the Hobson's choice—answer questions or be punished—a requirement otherwise immutable in a hierarchical, highly disciplined organization. Nothing other than Article 31's "early warning" rule would allow military personnel a meaningful opportunity to exercise their constitutional right to remain silent—a right they do not forfeit by joining the service.

*Miranda*, by contrast, is triggered only when a suspect is questioned while in custody, where his liberty is impinged in a meaningful and perceptible way (in that he does not feel "free to leave," to use the talismanic language). This is a significantly higher threshold for triggering the obligation to warn. It reflects the legal

reality that a civilian—even one who is suspected of a crime—can avoid answering questions without incurring any penalty as long as he is "free to leave" the presence of police. Of course, as a practical matter, most people feel obliged to respond to police inquiries, or are too frightened not to do so—and all too few are aware of their right not to respond to questions from law enforcement. But that is of no moment in *Miranda* jurisprudence.

So while Article 31 is quite properly viewed as the military cognate of *Miranda*, the two are not identical—if only because the threshold triggering them is so very different. As a result, a violation of Article 31 does not automatically translate into a violation of *Miranda*.[3]

But while *Miranda's* "custodial" threshold for providing warnings, not the UCMJ's, controls in this civilian court, I cannot pretend that Santiago was a civilian confronted by a police officer; he was a corporal in the Marines, being questioned by a superior officer. In and of itself, this fact does not give rise to a presumption that the interrogation is custodial; but it is a factor that must be considered when performing a *Miranda* "totality of the circumstances" analysis, and that factor weighs in favor of Defendant.

However, aside from the difference in their rank, all of the other attendant circumstances attest to the fundamentally non-custodial nature of Wang's inquiry: (1) Wang was not a law enforcement officer; (2) he was not conducting either a criminal or a disciplinary investigation, but a purely administrative inquiry; (3) Defendant remained armed throughout the process; (4) he was specifically told that his giving of a statement was voluntary; (5) he

was in no way restrained during the interview; (6) no one other than Wang was present at the interview; and (7) Defendant was allowed to leave immediately after answering questions. Taken together, the circumstances of Santiago's interview with Wang do not qualify as "restraints comparable to those associated with a formal arrest," which is what would be required to trigger *Miranda* warnings. Indeed, they do not approximate "restraints" at all.

Wang forthrightly admits that information he received from others prior to interviewing Santiago led him to suspect that his initial inquiry (did Carpeso shoot himself accidentally or on purpose) was based on an erroneous assumption (i.e., that Carpeso shot himself)—and that Santiago might have shot Carpeso. Put otherwise, Wang suspected that Santiago might have committed a crime under the UCMJ. This obviously has a bearing on whether Wang violated Santiago's Article 31 rights by not immediately terminating the administrative inquiry and moving to Article 31—a fact that would have been highly relevant in a court-martial. It might even have required suppression of the statements made to NCIS, depending on where UCMJ jurisprudence is on the "fruit of the poisonous tree" doctrine—a doctrine fast disappearing from *Miranda* jurisprudence.[4]

But Wang's suspicions have no bearing whatever on the question of custody for purposes of *Miranda*—i.e., whether a reasonable person in Santiago's position (i.e., a reasonable enlisted person being questioned by an officer in like circumstances) would have felt that he was restrained in a

---

**3.** I note that, when *Shafer* was litigated, *Miranda* was a very new decision—which may account for what I believe to be its overbreadth.

**4.** I confess that I have no idea whether the military still adheres to the fruit of the poisonous tree doctrine, though I can see perfectly good reasons why it might.

manner similar to a formal arrest. Wang did not communicate his suspicions to Santiago, so they could not have influenced how Santiago perceived the inquiry—and it is Santiago's perception of whether he was or was not free to leave that is relevant for *Miranda* purposes.

In short, I conclude that Defendant's statements to Wang cannot be suppressed under *Miranda* because Wang's questioning of Santiago was not "custodial."

█ As a fallback, Defendant argues that, even if he was not "in custody" during Wang's questioning, his statements to the Lieutenant should still be suppressed because they were not made "voluntarily."

Mr. Santiago was in a combat zone, under stress, deprived of sleep, and likely suffering from PTSD. He was a 23–year old corporal with a high school education, no legal training, and no prior contact with the law, who had spent the past 5 years obeying orders from Marine Officers. There is no evidence that he was aware of his right to refuse the questions asked by the Lieutenant. Under these circumstances, absent, at the very least, *Miranda* like warnings, his statements cannot be deemed voluntary.

Admittedly, Santiago was not in a happy place when he spoke with Wang. But he was in a far better position (or, at least, no worse) that many criminal defendants whose statements to the police are deemed entirely voluntary under *Miranda*. This court has encountered thousands of frightened young people who live in the civilian equivalent of combat zones, who have little or no education, let alone any legal training—and who have no idea that they can walk away from a police officer who ap-proaches them on the street without answering questions, or decline with impunity an "invitation" from a man or woman in blue to come down to the station house for "voluntary" questioning. If recent press accounts about military training can be credited, military personnel are routinely acquainted with all sorts of information about their rights—which is more than can be said for the children in drug-and-gang-infested ghetto neighborhoods.

Of course, if Santiago had no choice but to answer Wang's questions, the resulting statement could probably be suppressed on the ground that it was anything but "voluntary." However, Santiago does not contest Wang's assertion that the Lieutenant told him he did not have to give a statement,[5] nor does he allege that any coercion, other than Wang's status as an officer, was applied to make him speak. When a military superior indicates to a subordinate that he does not have to give a statement, so that the subordinate is no longer subject to discipline if he fails to answer questions, the serviceman occupies no better place under the law than a civilian who answers questions on the street when stopped by officers. Statements of the latter sort are ordinarily deemed "voluntary;" I see no reason why the former should not be as well.

In sum, I conclude, on the undisputed evidence, that there is no basis on which to suppress Defendant's statements to Lt. Wang under *Miranda*.

2. *Defendant's Interview with NCIS*

█ The second interview would seem to present fewer questions, since it is undisputed that, at some point, the NCIS

5. Wang states in his declaration that: "Prior to interviewing Santiago, Drude and Cellon, I advised them of their Privacy Act rights. I advised that statements were voluntary and any information they provided would be con-fidential. Santiago, Drude and Cellon provided statements after signing a form acknowledging their rights. (Wang Decl. at ¶ 8.) Santiago does not take issue with this.

agents gave Article 31 warnings (*i.e.*, *Miranda*-like warnings) and Santiago acknowledged in writing that he had received them. However, disputed issues of fact warrant a hearing.

Unlike Wang, the NCIS agents were most definitely law enforcement officers conducting what was by then a criminal investigation. Nonetheless, applying traditional *Miranda* analysis, Santiago does not appear to have been "in custody" when he began speaking with the NCIS agents. He arrived at the interview unescorted; he was not cuffed or restrained; he was told that he could terminate the interview at any time, for any reason. There is no indication that Defendant was taken into custody after he admitted that his gun had wounded Carpeso, or had his liberty restricted in any way. Again, to the extent that *Rogers* holds that every interview with military law enforcement personnel is necessarily custodial under *Miranda* (and I do not believe it so holds), I am not bound by it and, for the reasons discussed above, I disagree with it. Santiago was not "in custody" when he made his statements to NCIS.

Nonetheless, Defendant argues that his statements to NCIS should be suppressed.

First, he argues that his statements to NCIS were "tainted" by the earlier statement he made to Wang—a "fruit of the poisonous tree"—type argument. Since I have ruled that the statement made to Wang was not taken in violation of *Miranda*, this argument necessarily fails.[6]

Second, Santiago suggests that he was effectively coerced into making statements to NCIS agents, thereby rendering his statements involuntary (if not custodial).

Earlier in this opinion, I summarized Special Agent Dorsey's time line of what happened during the interview and when each thing occurred. Were Dorsey's account of the interview unrebutted, there would be no question that Santiago's statement was entirely voluntary and could never be suppressed under *Miranda*—if only because Dorsey attests that the interview opened with a reading of Defendant's Article 31 rights, and that Santiago immediately thereafter signed a form acknowledging receipt of those rights and waiving them.

Defendant, however, takes issue with the order of events. While he does not deny signing a waiver of rights, he avers that the agents told him that they believed Santiago had lied to Wang and that he faced a long jail sentence—but that his prior false statement would be overlooked if he "came clean"—and they did all this prior to giving him his Article 31 warnings. Santiago also states that he was not read his rights, and did not sign any "paperwork," until after he had made his admission to the NCIS agents.

Even if Santiago is correct about the order of events, I am tempted to respond: so what? I cannot count the number of times I have heard testimony about civilian police officers telling civilian suspects who were not "in custody"—even though they were sitting at a police station—that their denials were not credible, or that they were looking at lengthy sentences, or that the authorities would go easier on them if they told the truth. Statements of disbelief about denials and warnings about potential liability from law enforcement officers have never, to my knowledge, been held to be so inherently coercive as to vitiate the validity of a waiver of his rights,

---

**6.** The possibility that Santiago's statements to NCIS would have to be suppressed at a court-martial because they were tainted by Wang's violation of Defendant's Article 31 rights (discussed above) has no bearing on this *Miranda* analysis.

or to render a subsequently-made statement involuntary.

However, before making a final ruling on this aspect of Santiago's motion, I will conduct a hearing on this issue. In view of what I understand the First Circuit to have held in *Rogers,* I will want to know how Santiago came to be in the presence of the NCIS agents—who told him to go there; whether it was an order; and what else he was told about the reason for a second interview about Carpeso's shooting.

*Due Process Violation: Pre–Indictment Delay*

Santiago also moves to dismiss the indictment on the ground that the five year pre-indictment delay in this case violated the Due Process Clause. He argues that the government gained an unfair tactical advantage by waiting five years—until long after he was honorably discharged from the military—before pursuing criminal charges.

In his initial moving papers Santiago claims that he suffered prejudice from the delay because it deprived him of the broad protections afforded under the Uniform Code of Military Justice, in particular, Article 31—protections that he asserts are more favorable to an accused than those afforded under civilian law. In his reply papers, Defendant made the additional argument that the delay precluded him from calling witnesses who would have been available to him in a trial by court martial—specifically "Hollywood," the Iraqi translator, who was present during the incident, and who was the only eyewitness to the shooting other than Santiago and Carpeso (who, apparently, did not see what happened). Santiago argues that Hollywood would testify that Defendant did not "quick draw" his weapon on the night Carpeso was shot—which (as discussed above) is the Government's theory of recklessness. According to Defendant,

in five sworn statements given to NCIS agents, Hollywood never once said that Santiago was "quick drawing" that night, which is what the Government will have to prove beyond a reasonable doubt in order to establish recklessness. In one instance, when asked specifically by investigators "whether Santiago was playing quick draw with his weapon vise [sic] cleaning it," Hollywood replied, "No." (*See* Defendant's Reply Exhibit D & E).

The Second Circuit has long held that, "Criminal prosecutions brought within the statute of limitations period bear 'a strong presumption of validity' and 'are only rarely dismissed.'" *United States v. Cornielle,* 171 F.3d 748, 751–52 (2d Cir. 1999). A defendant who alleges that an indictment, though brought within the statute of limitations, nonetheless violates his due process rights bears the "'heavy burden' of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose." *Id.* at 752 (*citing United States v. Scarpa,* 913 F.2d 993, 1014 (2d Cir.1990) (emphasis in original)).

Actual prejudice—as used in this context—is "commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness." *Id.; see, e.g., United States v. Lovasco,* 431 U.S. 783, 796, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Of course, "commonly" is not synonymous with "exclusively"; with its careful choice of words, the Supreme Court in *Lovasco* left open the possibility that something other than loss of a witness or other evidence might qualify as "actual prejudice." Whether the loss of any additional rights or procedural protections afforded a serviceman accused of a crime under the UCMJ qualifies as "actual prejudice" appears, like so much else in this

case, to raise a question of first impression. The parties have not yet educated the court on what differences, if any, exist between the procedural protections afforded military personnel at courts-martial and those given to criminal defendants in federal district courts. As a result, I cannot determine what, if any, prejudice Santiago suffered by not being prosecuted in a court-martial. I look forward to receiving some more concrete information on this topic. I would also appreciate additional briefing on the issue of "prejudice," specifically addressing whether anything other than the loss of evidence or the unavailability of a witness has ever been held to be prejudicial in the sense contemplated by *Lovasco* and *Cornielle.*

Assuming that he would give testimony favorable to the defense—which is a fair inference, given his statements to NCIS—the unavailability of "Hollywood," the only eyewitness to the alleged crime other than Santiago and Carpeso, could well qualify as actual prejudice. The importance of his testimony cannot be overstated. No one (other than Defendant) can attest to whether Santiago "quick drew" or "dry fired" his weapon on the day in question. I am sure the Government will point out that "Hollywood's" testimony on this point could be duplicative if Santiago testifies at trial and repeats his denial to NCIS that he dry fired his weapon that day. But Defendant's credibility, should he choose to testify, will be subject to attack on the ground that he originally denied firing a weapon at all. Whether he testifies or not, Hollywood's statement (assuming it were repeated at trial) would be critically important to attacking the sufficiency of the Government's proof of recklessness—

which, as far as I can tell, rests entirely on evidence that may be inadmissible.[7]

I appreciate that, in *Lovasco,* the United States Supreme Court concluded that the passage of time after all the evidence against the defendant had been gathered was not sufficient to show "actual prejudice" resulting from pre-indictment delay—even though two potential defense witnesses died during the interval between the end of evidence—gathering and indictment. However, the Supreme Court also said that due process protected against "oppressive" pre-indictment delay, and that any due process analysis had to consider "the reasons for the delay." *Id.* at 790, 97 S.Ct. 2044. In *Lovasco* itself, the district court had held a hearing, at which the Government was able to establish that it had continued its investigation in order to ascertain whether the defendant's son had also been involved in the crime. The death of the potential defense witnesses was deemed insufficient to warrant dismissal of the indictment because the Government had a paramount interest in taking the factual investigation to its conclusion and charging all potentially culpable parties. No such considerations are in play here.

As for the requisite demonstration of improper purpose: the Second Circuit has instructed that the "government's decision to refrain from charging a defendant pending investigation of his conduct is not, absent more, an 'improper' pre-indictment delay." *United States v. Dinero Express, Inc.,* 57 Fed.Appx. 456, 459 (2d Cir.2002); *see also Lovasco,* 431 U.S. at 795, 97 S.Ct. 2044 (only where pre-indictment delay is for an improper purpose will due process be violated). However, the Government does not here argue that Santiago's prose-

---

**7.** I refuse to decide the 404(b) issues now, but I can certainly predict what they are going to be.

cution (first by the Marine Corps, then by the United States Attorney) was delayed for five years because of the need for a lengthy investigation into the facts—or, as in *Lovasco*, because of the need to investigate whether others besides the defendant were involved in the criminal conduct. Within two weeks after the shooting, all the witnesses had been interviewed, forensic evidence establishing that Carpeso did not shoot himself had been obtained, and Defendant had admitted to firing the shot that wounded the medic (although he did not confess to doing so recklessly). If the Government's proffer be credited, not only was the investigation complete by February 2008, but the decision to court-martial Santiago had been made! For that reason, *Dinero*—in which the Government needed to spend an extended period investigating a complicated money laundering operation, analyzing documents seized from target company "Dinero Express" and debriefing witnesses and cooperating defendants before deciding whether to indict—is completely inapposite. *Dinero Express, Inc.*, 57 Fed.Appx. at 459.

No, instead of a long investigation, the Government blames "a communication breakdown within the USMC ....," for the five year delay between incident and indictment. I have absolutely no idea what that means, so I cannot possibly decide whether it masks some improper purpose.

The Government could simply be saying that Santiago's file was lost for four and a half years, only to surface within a short time before the civilian statute of limitations expired. But I cannot imagine what dog could have eaten that homework, and then failed to regurgitate it during the forty-two months while the Marine Corp. retained UCMJ jurisdiction over Defendant.[8] It is particularly hard to fathom since Santiago was back in the United States—with his commanding officer's recent decision to court-martial presumably right there in his file—only a few weeks after the on-site factual investigation concluded. Neither can I imagine how the lost file would have come to be found after Santiago was no longer of any concern to the Marine Corps. Anyway, I suspect that the Government would have come out and said so if all we were talking about is a lost file.

Furthermore, while a "communications breakdown in the Marine Corps" might explain why Santiago was not court-martialed, but it does not explain why this matter was not brought until the every last second before the limitations period expired. I have no idea when this matter was referred to the Government, or how long it lay at the Department of Justice. And since the concept of trying a Marine civilly for conduct committed in a war zone pursuant to a statute that was designed to confer jurisdiction over persons not subject to the UCMJ is new to me, I have no idea what is involved in making a determination to proceed under MEJA, or how long that would/could/should take.

*Cornielle* and *Lovasco* also require the court to assess whether delay was a course

---

8. Defendant's counsel has represented to the court that Santiago, aware of the possibility that he might be charged in connection with the Carpeso shooting, actually called a Marine Corps legal officer shortly before he left the Reserves and asked whether he was in any jeopardy arising out of the incident. He was told no. (Tr. of Proceedings on February 19, 2013, at 13.) Had he been told otherwise, Santiago could have taken legal counsel before he mustered out. He might even have signed up for another tour in the Reserves, and so remained subject to UCMJ jurisdiction and court-martial. Assuming this representation is corroborated by evidence, it could be material to any pre-indictment delay/due process analysis.

intentionally pursued by the Government for an improper purpose; mere delay, even delay leading to prejudice, does not suffice. The improper purposes alleged here (or at least, the improper purposes that I infer from Defendant's motion) are identical to the prejudice that Santiago claims to have suffered by virtue of the delay: he has been deprived of the more favorable procedural protections of the UCMJ, and deprived of the testimony of the only person who saw what happened, and whose accounts to NCIS appear to support Defendant's position that he did not behave in a reckless manner. Obviously, if either of those factors played into the failure to court-martial Santiago, either in Iraq or within a reasonable period after his return home, it would lend a not entirely savory flavor to the matter. For example, the Government has represented that Santiago's convening authority decided to court-martial him before he left Iraq in March 2008, but postponed bringing charges until he was back in the United States. If that decision were informed, in whole or in part, by the fact that "Hollywood"—who had denied that Santiago "quick drew" his weapon—would be remaining in Iraq and so would become unable to testify, it would raise an issue under *Lovasco/Cornielle*. So would evidence that what the Government cryptically refers to as a "communications breakdown within the USMC" actually reflects some difference of opinion within the Marine Corps, or between the Corps and NCIS, over how this matter should have been handled in the first place.

This is not some minor or technical issue. The words "concurrent jurisdiction" do indeed appear in MEJA, but when they are read in context, it is patent that Congress intended for active duty service personnel to be tried in military courts, not in a United States District Court—and to be judged by a jury of other soldiers and sailors, not civilians unfamiliar with military matters and conditions in a theatre of war. MEJA mentions "concurrent jurisdiction" in order to make it clear that the jurisdiction it confers does not oust military tribunals and courts-martial of jurisdiction over offenses properly remitted to them; and the statute goes on to bar trial in a civilian court of any active duty officer or enlisted person who is subject to the jurisdiction of the UCMJ. Santiago was subject to the jurisdiction of the UCMJ (1) at the time he discharged his weapon, (2) during the ensuing investigation, (3) when (according to the Government) the decision to court-martial was made, and (4) for three and one half years thereafter. He thus should presumptively have been prosecuted by court-martial if he was to be prosecuted at all. The only exception to this rule is for a member of the military who conspires with a civilian not subject to the UCMJ—a fact pattern inapplicable to Santiago's situation.

Trying a former serviceman like Santiago in a civilian court for a crime that was committed and investigated, but not court-martialed, while he was in service is an exercise fraught with peril. This court can envision situations in which MEJA could be used to do an "end run" around a decision not to court-martial that left someone dissatisfied, or to get the proverbial "second bite at the apple" in a case where procedural errors rendered it difficult or impossible to bring a military prosecution (which is, I note, a possibility raised by the facts of this very case). I doubt very much whether this was Congress' intent in passing MEJA; it is certainly not why the Second Circuit referred the issue to Capitol Hill after *Gatlin*.

So in order to decide Santiago's due process motion, we must establish why he was not court-martialed while it lay within the Marines' power to do so. We must

also establish why it took another year and a half to indict him civilly after he ceased to be subject to the UCMJ. It is impossible to assess the due process implications of this long-delayed prosecution without knowing the story behind this very peculiar fact pattern, and at present the record on this score is woefully incomplete. *Lovasco* counsels that a hearing to develop the facts is not only justified, but mandatory.

Accordingly, the Court will hold a hearing into the issues raised by Defendant's due process motion—specifically, why it has taken five years for his case to wend its way from an Iraqi battlefield to a Manhattan courtroom. I want to understand why Defendant was not court-martialed for a theatre-of-war-shooting that he admitted within days of its occurrence—either during his active service [9] or while he served in the Marine reserves—and when and how civilian authorities came to reopen a matter that seemingly closed with Santiago's honorable discharge. I emphasize again that this case is not a case where a defendant slipped out from under UCMJ jurisdiction before anyone authorized to convene proceedings against him knew what he had done; it is not a case where there was ever a jurisdictional gap that needed to be filled. Santiago, unlike Green and Nazario, could have been court-martialed; so his presence in this court makes no sense to me.

Obviously, such a hearing goes beyond what the parties originally anticipated, and cannot be held next week—or next month, either, given the court's trial schedule and the amount of time it will take for the Government to get the witnesses together. I am prepared to arrange for two-way real time communication in order to take testimony from individuals who, because of their duties, may not be available to come to New York.

The trial of this matter is presently scheduled for October 21, 2013, at 10 AM, but I would prefer to use that time to conduct this hearing. Defendant is not presently incarcerated and I assume he will waive his Speedy Trial rights so we can develop a record that would allow him to make his due process argument more intelligibly. We can reschedule the trial for just after the first of next year.

This constitutes the decision and order of the Court.

---

**9.** This includes why, if the decision to court-martial was made by his field commander prior to his return to the United States, the court-martial was not held in Iraq.